**REVISED, June 12, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-30935

_____


JAMES SNYDER,

> Plaintiff-Appellee-
> Cross-Appellant,

VERSUS

SIDNEY TREPAGNIER, et al.,

> Defendants-Appellees,

CITY OF NEW ORLEANS,

> Defendant-Appellant-
> Cross-Appellee.


_____

Appeals from the United States District Court
for the Eastern District of Louisiana

_____


Before MAGILL,[*] SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


The City of New Orleans ("the city") appeals a judgment of liability under 42 U.S.C. § 1983 for the shooting of James Snyder by police officer Sidney Trepagnier. Snyder cross-appeals, contending that the district court erred in submitting to the jury

---

[*] Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

the question of Trepagnier's qualified immunity.  We reverse the judgment insofar as it imposes liability against the city but affirm insofar as the judgment grants Trepagnier qualified immunity.  We affirm the refusal to find liability for assault and battery.

I.

Snyder was shot in the back by Trepagnier while fleeing on foot from police following a high-speed chase.  Although the precise facts surrounding the shooting are not apparent from the briefs,[2] this much is clear:  Trepagnier was pursuing Snyder

---

[2] Our review is complicated by the city's failure to include a statement of the facts in its brief.  This omission violates FED. R. APP. P. 28(a)(4), which requires "a statement of the facts relevant to the issues presented for review, with appropriate references to the record," and 5TH CIR. R. 28.3 (a)(2), which requires a statement of facts.

With appropriate references to the record, Snyder presents the following facts:

[Trepagnier] shot James Snyder in the back while Mr. Snyder was unarmed, stuck in the mud to his knees, and offering no resistance whatsoever.  Mr. Snyder had only one arm, in which he was carrying sunglasses and two packs of cigarettes that were found on the ground next to him at the scene, so that he could not have been carrying a gun.  No gun was ever found on the scene despite a thorough and systematic search by officers using a grid pattern.  It was stipulated that Trepagnier "in shooting James Snyder, intended to pull the trigger, and that this was not the result of negligence, inadvertedness, mistake, or accident."

Trepagnier caught appellee when he became stuck in the mud, straddled him as he laid [sic] down and placed a gun to Jim Snyder's head.  Trepagnier yelled to Snyder's companion, Todd Taylor, to come back or he would shoot Snyder.  Snyder told Taylor to keep running, he can't shoot me, I don't have a gun.  Officer Trepagnier began screaming and pushing the gun in the side of his head, threatening to shoot Snyder, and eventually Taylor came back.  Trepagnier had Snyder put his face in the mud, asking why he had run; Snyder answered that he was wanted in Pennsylvania.  At that point he shot Snyder at close range in the back.  Snyder asked him why he did that and Trepagnier said, "the swamp's a hell of a place to die, ain't it?"

(continued...)

2

through the swamps when the officer shot Snyder in the back, paralyzing him from the waist down. The parties disagree over whether Snyder had a gun. Trepagnier testified that he saw Snyder wielding a small pistol as he raced through the swamps. Snyder claims that he was unarmed and stuck in the mud when he was shot. In any event, no gun was ever recovered from the scene, despite an exhaustive search.

Snyder sued Trepagnier, Officer Joseph Valiente, and the city (as well as the Mayor and Police Superintendent in their individual and official capacities) under § 1983. Snyder also sued Trepagnier for assault and battery under Louisiana law. The case was tried to a jury. Before the verdict, the court dismissed Snyder's claims against Valiente, the Mayor, and the Police Superintendent, leaving Trepagnier and the city the only remaining defendants.

The jury rendered its verdict in the form of answers to special interrogatories. It found that Trepagnier had violated Snyder's constitutional rights but was protected by qualified immunity. The jury also found that Trepagnier had not committed an assault and battery. Even though the jury concluded that Trepagnier had acted reasonably in shooting Snyder, it held the city liable on the ground that the constitutional deprivation was caused by a municipal custom or policy.

The jury did not specify the policy at fault, although Snyder's expert witness had offered several customs and policies as

---

(...continued)
(Emphasis and record references omitted.)

3

possibilities.  Specifically, Snyder had alleged that the hiring and screening policies of the New Orleans Police Department ("NOPD") were deficient; that the NOPD enforced a "code of silence" that fostered a permissive attitude toward violence against civilians; and that the NOPD failed to train officers in stress management and did not put in place an "early warning system" that would signal when stressed officers were about to crack.  In its post-verdict review of the sufficiency of the evidence, the district court relied on the city's failure to enact a stress management program for police officers as supporting liability under § 1983.

The jury awarded Snyder $1,964,000SSthe amount of his past and future medical expenses.  Yet it awarded Snyder nothing for past and future physical pain and suffering, nothing for past and future mental pain and suffering, nothing for permanent physical disability and loss of function, and nothing for loss of life's pleasures.[3]

Both sides filed post-trial motions.  The court denied the city's motion to reconsider and reconcile the jury verdict by entering judgment dismissing the city as a matter of law, orSSin the alternativeSSto grant the city a new trial on both liability and damages.[4]  The court then granted Snyder's motion for a new

---

[3] These were all categories on the jury's list of special interrogatories. The jury filled in "$0" for each of these categories.

[4] The court attempted to reconcile the verdict as follows: The city violated § 1983 by failing to enact a stress management program.  This failure created a group of overstressed police officers, one of whom was Trepagnier.
(continued...)

4

trial on damages. Acknowledging that damage awards can be overturned only in "extreme and exceptional" circumstances, the court concluded that such were present, remarking: "It is inconceivable for a jury to find that an individual who has been shot in the back, subjected to multiple operations, hospitalized for several months and will be confined for the rest of his life to a wheel chair endured no pain and suffering and permanent disability."

## II.

The city contends that the evidence was insufficient to support a finding of § 1983 liability under *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978).[5] We may overturn a jury verdict only if it is not supported by substantial evidence, meaning "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Boeing Co. v. Shipman*, 411 F.2d 365, 374

---

(...continued)
Accordingly, when Trepagnier shot Snyder, he was behaving reasonablySS"as an improperly trained, over-worked and overly stressed officer would be expected to act under those circumstances."

[5] Snyder suggests that the city waived this claim by failing to move for a directed verdict at the close of the evidence as required by FED. R. CIV. P. 50(b). Both sides agree that the city moved for "judgment on the pleadings" at the close of the evidence; the city says this was a motion for a directed verdict. In any event, "[T]his court has not required strict compliance with Rule 50(b) and has excused technical noncompliance where the purposes of the requirement have been satisfied . . . . These purposes are met when the court and the plaintiff are alerted to the grounds on which the defendant contends the evidence is insufficient prior to the submission of the case to the jury." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1244 (5th Cir.), *cert. denied*, 118 S. Ct. 558 (1997) . Snyder concedes that the city challenged the sufficiency of the evidence on "three specific grounds" prior to the submission of the case to the jury.

(5th Cir. 1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc). We accord all reasonable inferences to the nonmovant, and we reverse only if no reasonable jury could have arrived at the verdict. *Right Weigh Scale Co. v. Eaton Corp.*, 998 F.2d 287, 289 (5th Cir. 1993).

## A.

The Supreme Court has established two fundamental requirements for holding a city liable under § 1983 for inadequate hiring and training policies: culpability and causation. First, the municipal policy must have been adopted with "deliberate indifference" to its known or obvious consequences. Second, the municipality must be the "moving force" behind the constitutional violation.

In *Monell*, the Court held that a local government may not be held liable under *respondeat superior* for constitutional torts committed by a municipal employee. Instead, "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694. *Monell* set a high threshold for causation as well, requiring that the plaintiff establish that the municipal policy be the "moving force" behind the constitutional violation. *Id*.

The Court clarified the *Monell* requirements in *City of Canton v. Harris*, 489 U.S. 378 (1989), a case arising under a liability

theory (failure to train) that Snyder presses here. The Court held that, in limited circumstances, a municipality can be held liable for a failure to train its police officers. Plaintiffs seeking to win under this theory must first prove a direct causal link between the municipal policy and the constitutional deprivation; they then must establish that the city consciously enacted a policy reflecting "deliberate indifference" to the constitutional rights of its citizens. *Id*. at 389. The Court concluded:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipalitySSa "policy" as defined by our prior casesSScan a city be liable for such a failure under § 1983.

*Id*. at 388-89.

The Court further clarified *Monell* in *Board of County Commissioners v. Brown*, 117 S. Ct. 1382 (1997), another case arising under a liability theory advanced in the instant caseSSthe municipality's allegedly inadequate screening and hiring policies. There, the Court held that the county was not liable for a sheriff's decision to hire, without adequate screening, an officer who later was accused of using excessive force. The Court noted that the plaintiff had "not demonstrated that [the sheriff's] decision reflected a conscious disregard for a high risk that [the officer] would use excessive force in violation of [the plaintiff's] federally protected right." *Id*. at 1394.

*Bryan County* underscores the need for *Monell* plaintiffs to establish both the causal link ("moving force") and the city's

7

degree of culpability ("deliberate indifference" to federally protected rights). These requirements must not be diluted, for "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *Id.*

Accordingly, we have demanded a high standard of proof before imposing *Monell* liability on a municipality. In *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745 (5th Cir. 1993), we held that a school board did not act with deliberate indifference to the constitutional rights of schoolchildren when it failed to remove from the classroom a teacher accused of fondling students. We noted that mere negligence fell short of the "deliberate indifference" standard and that "[i]n order for municipal liability to attach, plaintiffs must offer evidence of not simply a decision, but a 'decision by the city itself to violate the Constitution.'" *Id.* at 759 (*quoting City of Canton*, 489 U.S. at 494-96 (O'Connor, J., concurring)).

Similarly, in *Stokes v. Bullins*, 844 F.2d 269 (5th Cir. 1988), we held that a county that failed to request a National Crime Information Center check for police applicants did *not* act with deliberate indifference toward the rights of its citizensSSeven though conducting a check would have disclosed that the applicant (who later shot the plaintiff) had a history of fifteen arrests for assault, armed robbery, and other misdeeds. We saluted the efficiency of an NCIC check but shied away from anointing it as a constitutional requirement. *Id.* at 275.

B.

In reviewing the sufficiency of the evidence, we examine the three municipal policies offered at trial that might support a finding of *Monell* liability. Applying *Bryan County*'s "rigorous requirements of culpability and causation," 117 S. Ct. at 1394, we conclude that the evidence is insufficient to uphold the jury verdict.

1.

Snyder alleges that the city's police hiring policies were deficient because candidates' backgrounds were inadequately investigated. Most of Snyder's evidence came from James Ginger, who was offered as an expert witness in the field of police operations and administration. Ginger observed that the city overlooked two blemishes on Trepagnier's application: He had admitted to stealing a jacket and to having smoked marihuana over a two-and-a-half-year period. Moreover, the city did not conduct oral interviews but relied on written statements from Trepagnier's friends and neighbors. Finally, Ginger charged that although the city had a psychologist perform a "personality test" on Trepagnier, the test form did not include room for the psychologist's narrative interpretation, nor did it note Trepagnier's specific score, because the tests were graded pass/fail. Ginger testified that these omissions indicated that the city's screening policies fell short of "national standards," thus providing the basis for § 1983 liability.

9

This evidence is insufficient under *Bryan County*, where the Court held that "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id*. at 1392. The Court held that the county was not liable for a tort committed by a police officer, even though the sheriff had hired the officer despite a lengthy criminal record, including assault and battery, resisting arrest, and public drunkenness. The Court concluded that "[t]he connection between the background of the particular applicant and the specific constitutional violation must be strong." *Id*.

Trepagnier had admitted to two nonviolent offenses: stealing a jacket and smoking marihuana. On this evidence, Snyder's claim that the city's screening policies were inadequate fails the *Bryan County* test: that the plaintiff's injury be the "plainly obvious consequence" of the hiring decision.[6]

2.

Snyder's next complaint is that the NOPD enforced a "code of

---

[6] Ginger's argument that the city's psychological testing fell short of "national standards"§§thus violating § 1983§§was rejected in *Bryan County*, 117 S. Ct. at 1394, in that Ginger seeks to "constitutionalize hiring requirements that States have themselves elected not to impose." *See also Stokes*, 844 F.2d at 275 (refusing to designate an NCIC background check a constitutional requirement).

10

silence" that fostered a permissive attitude toward violence against civilians. To bolster this allegation, he introduced evidence concerning what he terms the "Pembrook incident." In 1986, six years before Snyder's shooting, Trepagnier (while off-duty) verbally abused and grabbed Herman Pembrook, who had just been in a car accident involving Trepagnier's girlfriend. Other officers, present at the accident site, restrained Trepagnier. Pembrook filed a complaint with the Office of Municipal Investigation (a city agency independent of the NOPD), but that office dismissed the complaint, and Pembrook never filed criminal charges.

Ginger testified that the fact Trepagnier would threaten and intimidate a civilian in front of his fellow officers revealed the existence of a code of silence.[7] This was the only citizen complaint ever filed against Trepagnier, who was hired in 1981.

The remaining evidence establishing the code of silence came in the form of assorted policy papers and reports. It appears that no one save Ginger was asked to interpret or discuss these materials, many of which were excluded as hearsay.

---

[7] Ginger concluded:

For someone to exhibit that kind of behavior in front of his supervisor is remarkably unusual in policing. . . . [T]hat requires the officer to believe that he can behave with violence towards citizens with impunity. In other words, for the officer to behave that way, he has to believe he can get away with it. . . . It indicates a culture that is protective of its officers. It indicates the existence of a very deeply-rooted code of silence . . . a code within the police department that, regardless what the behavior, one police officer does not report or testify against another police officer. . . . It exists in most police agencies, but that indicates that the code of silence in the New Orleans Police Department is operating to the level that officers will attempt to assault citizens in front of their supervisors.

11

Snyder relies on a single case to support premising § 1983 liability on a code of silence theory: *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985). There, we imposed municipal liability for a policy of "prevalent recklessness" when a group of police officers mistook a man for a fugitive, surrounded him, and killed him. *Grandstaff* has not enjoyed wide application in this Circuit. For example, we distinguished it in *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986), noting that "*Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set of facts. . . . The *Grandstaff* panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations."[8]

The shooting of Snyder, who was fleeing police pursuit, hardly rises to the level of the "extraordinary factual circumstances" presented in *Grandstaff*SSparticularly given the absence of evidence suggesting a culture of recklessness in the NOPD. In sum, the evidence was insufficient to support *Monell* liability on a code-of-silence theory.

### 3.

We now turn to Snyder's primary argument for *Monell* liability: that the NOPD failed to train officers in stress management and failed to adopt an "early warning system" that would signal when an officer was about to "crack." This appears to be the basis on which the district court concluded that the verdict was supported

---

[8] *See also Stokes*, 844 F.2d at 274 n.8 (refusing to apply *Grandstaff*).

12

by the evidence.  The court noted:

> Specifically, the evidence supported a conclusion that
> Officer Trepagnier was improperly trained, overworked,
> and stressed due to unconstitutional practices of the
> City which led directly to the constitutional
> depr[i]vation involved.  Apparently, the jury felt the
> constitutional depr[i]vation was not due to intent or
> wanton disregard on Trepagnier's part but that he was
> improperly trained or overly stressed.

Evidence of Trepagnier's stress level came from two lay
sources.  First was the testimony of Pembrook, who stated that a
sergeant excused Trepagnier's aggressive behavior by explaining
that Trepagnier worked long hours and was under considerable
stress.  Second was what Snyder terms "an excessive number of
injuries to the dominant hand while effecting arrest."

According to Ginger, Trepagnier's personnel file revealed an
unusually high number of injuries to his hand: five injuries over
a three-year period.  Because officers are trained to strike with
their baton rather than their hand, a higher-than-average number of
hand injuries may indicate a quick temper.  Ginger also testified
that an early-warning system would have caught Trepagnier's hand-
injury situation, highlighting the need for psychiatric counseling
before the officer exploded.  Ginger did not claim that such a
system would have prevented Snyder's injury, but it would have
reduced the likelihood by making Trepagnier "a much better officer,
much more under control and much less likely to enter into the
Snyder shooting."

In *City of Canton*, 489 U.S. 378, the Court articulated the
test for when *Monell* liability can result from inadequate training.
The opinion is worth quoting at length:

13

It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. . . .

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.

*Id.* at 390-91 (footnote and citations omitted).

Moreover, we have held that proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training. The plaintiff must demonstrate "at least a pattern of similar incidents in which the citizens were injured . . . to establish the official policy requisite to municipal liability under section 1983." *Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir. 1989) (internal quotation and citation omitted).

Under *City of Canton*, 489 U.S. at 389, in order to prove the city's deliberate indifference, Snyder must show that the failure to train reflects a "deliberate" or "conscious" choice to endanger constitutional rights.[9] Ginger contended that the city had notice

---

[9] The *Canton* Court gave an example of when *Monell* liability may attach from a failure to train: "For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this
(continued...)

14

of the dangerously high stress levels throughout the NOPD based on the Pembrook incident in 1986 and Trepagnier's five hand injuries over three years.

Even if we accept that this evidence proves Trepagnier was dangerously stressed, there was no probative evidence concerning the stress level in the NOPD as a whole. There was no evidence of a pattern or practice of constitutional violations committed by overstressed New Orleans police officers. There was no evidence showing that the city was *aware* of the supposedly high stress levels in the NOPD or knew that the absence of a stress management program was likely to endanger the constitutional rights of its citizens. In short, the totality of the evidence does not even approach the *City of Canton* standard: that the inadequacy be "so obvious" and "so likely to result in the violation of constitutional rights," 489 U.S. at 390, that the city can be said to have been deliberately indifferent.

Furthermore, we have emphasized that, when seeking to prove a municipality's malevolent motive, plaintiffs must introduce more evidence than merely the opinion of an expert witness. In *Stokes v. Bullins*, 844 F.2d 269 (5th Cir. 1988), the district court relied primarily on the testimony of a single expert witness in holding that the municipality violated § 1983. We disagreed, remarking that "an expert's opinion should not be alone sufficient to

---

(...continued)
task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 489 U.S. 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n.10.

15

establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards." *Id*. at 275. Ginger's testimony that New Orleans failed to meet "national standards" was unsupported by any facts establishing the city's purportedly bad motive.

Proof of "moving force" causation was similarly absent. The evidence did not establish even a remote link between the city's failure to enact a stress management program and Snyder's injury, so it fell far short of meeting the "rigorous" and "stringent" causation requirements demanded in *Bryan County*. Moreover, under Ginger's theory, any violent act by a police officer could be "caused" by stress, which in turn would be "caused" by the absence of a stress management program. Were we to adopt this line of reasoning, a city might be liable under § 1983 any time an officer acted in a way that could be characterized as resulting from stress. We reject this as a constitutional requirement.

There was insufficient evidence to support the imposition of § 1983 liability under Ginger's stress management theory. There was no evidence of deliberate indifference to constitutional rights. Nor was there evidence supporting a causal link between the absence of a stress management program and Snyder's injury. No reasonable jury could have concluded otherwise.

III.

A.

Snyder argues that the district court erred in submitting the question of Trepagnier's qualified immunity to the jury. We disagree. While qualified immunity "ordinarily should be decided by the court long before trial," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), if the issue is not decided until trial, the defense is not waived but goes to the jury, which "must determine the objective legal reasonableness of [the] officer's conduct by construing the facts in dispute." *Melear v. Spears*, 862 F.2d 1177, 1184 (5th Cir. 1989) (footnote omitted). So, "if . . . there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question." *Presley v. City of Benbrook*, 4 F.3d 405, 410 (5th Cir. 1993).[10]

Here, important factual questions remained for trial. Specifically, the jury needed to determine what sequence of events occurred, and, in particular, whether Snyder had a gunSSor, if he did not actually have a gun, whether Trepagnier reasonably believed he did. Accordingly, there is no doubt that the district court properly decided to submit the issue of qualified immunity to the jury.

B.

A related question is whether the issues of liability and qualified immunity should have been fashioned as one issue or, as the district court submitted them, as two issues. The submission

---

[10] *See Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994); *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993).

as two separate issues results in the dispute whether the jury's answers are irreconcilable.

The jury decided both that Trepagnier used excessive force, thereby depriving Snyder of his constitutional rights, *and* that Trepagnier had a reasonable belief that his actions would not violate Snyder's constitutional rights. On the basis of these answers, the district court granted Trepagnier qualified immunity. If, however, a finding of excessive force is tantamount to a finding of no objective reasonableness, the answers to the two interrogatories would be hopelessly in conflict, requiring a new trial with, perhaps, a different charge.

In reviewing jury answers to special verdicts, we must make a "concerted effort to reconcile apparent inconsistencies . . . if at all possible." *Alverez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1040 (5th Cir. 1982). We must ask whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted, even though the form of the issue or alternative selective answers prescribed by the judge may have been the likely cause of the difficulty and largely produced the apparent conflict." *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973). Only if there is no view of the case that will make the jury's answers consistent may we set aside its decision. *Id*.

There is no inherent conflict between a finding of excessive force and a finding of qualified immunity. In *Brown v. Glossip*, 878 F.2d 871, 873-74 (5th Cir. 1989), we squarely held "that qualified immunity is available as a defense to monetary liability

18

for an objectively unreasonable use of excessive force under the Fourth Amendment."

There are two components to the qualified immunity inquiry: "'[(1)] clearly established law and [(2)] the information the . . . officers possessed.'" *Hunter*, 502 U.S. at 227 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). This was cogently explained by Judge Higginbotham in *Melear*, 862 F.2d at 1187-88 (Higginbotham, J., concurring): "[I]t is possible for the jury to find that, although the actual circumstances of the search did not justify the officer's behavior, the circumstances *that appeared to the officer* would have justified a search. That is, the officer could make a constitutionally reasonable judgment based upon a factual misperception." *Id.* at 1188. "[I]t might be possible for the jury to resolve factual ambiguities so as to conclude that a constitutional violation took place, even though it is *not* possible for the jury to resolve factual ambiguities so as to conclude that the violation was the product of an objectively unreasonable mistake." *Id.*

This is what happened in *Presley*, where the jury determined that although the officers committed a constitutional violation, they were entitled to qualified immunity. *See Presley*, 4 F.3d at 407. Specifically, the jury, in answer to the first question, said the officers' entry of plaintiff's residence violated the Fourth Amendment. This answer was in plaintiff's favor, but the answer to the second was not, for the jury answered "yes" to the question whether a reasonable officer possessing knowledge of clearly

19

established law and the information known by the officers at the time, could have believed that the entry of plaintiff's residence was lawful. The panel concluded that the two answers "are not inconsistent," because "an officer may make mistakes that infringe constitutional rights and yet not be held liable where, given unclear law or uncertain circumstances, it cannot be said that she knew she was violating a person's rights." *Id.* at 409 (citing *Anderson*, 483 U.S. at 642).[11]

## C.

With the law thus explained, we proceed to discharge our duty to make a "concerted effort to reconcile apparent inconsistencies [in the jury's answers] . . . if at all possible." *Alverez*, 674 F.2d at 1040. The jury's answer that Trepagnier used excessive force apparently was based on its conclusion that Snyder did not actually have a gun. The jury's additional answer that "Trepagnier had a reasonable belief that his actions would not violate [Snyder's] constitutional rights" must have been based on a finding that Trepagnier *reasonably believed* Snyder had a gun so that, given the "uncertain facts" Trepagnier possessed, "it cannot be said that [he] knew [he] was violating a person's rights." *Presley*, 4 F.3d at 409.

---

[11] Some other circuits disagree and take the position that a finding of excessive force precludes a finding of qualified immunity. *See Alexander v. County of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995); *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994); *Hunter v. District of Columbia*, 943 F.2d 69, 77 (D.C. Cir. 1991) (citing cases, and citing *Brown* as "*but see*"); *Street v. Parham*, 929 F.2d 537, 540 (10th Cir. 1991).

There was sufficient evidence from which the jury could have found what it did in answer to the two interrogatories at issue. Accordingly, there is no internal conflict in the verdict, and the district court properly granted qualified immunity to Trepagnier.[12]

## IV.

Snyder challenges several evidentiary rulings. We review for abuse of discretion. *United States v. Torres*, 114 F.3d 520, 526 (5th Cir.), *cert. denied*, 118 S. Ct. 316 (1997). Snyder objects to the admission of evidence concerning his criminal history and to the exclusion of several reports purportedly documenting the NOPD's failure to comply with national standards of police training and administration. The evidence of Snyder's criminal conduct in the period before the shooting was admitted as probative of Trepagnier's state of mind and the reasonableness of the officer's behavior, and we find no abuse of discretion. Our holding regarding the city's liability renders moot the question of the city's adherence to national standards.

## V.

Accordingly, we REVERSE the portion of the judgment holding

---

[12] Nor do we find that the court erred in dismissing Snyder's claim against Valiente. Under *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995), Valiente could be held liable only if Snyder proved that Valiente was present at the scene of the shooting but did not take reasonable measures to prevent Trepagnier from using excessive force. In light of Snyder's admission that he did not know whether Valiente was in the area when he was shot, and the absence of probative evidence suggesting otherwise, the district court did not abuse its discretion in dismissing Valiente.

the city liable under § 1983 and RENDER judgment for the city.  We AFFIRM the portion of the judgment granting Trepagnier qualified immunity and AFFIRM the refusal to find liability for assault and battery.

<span style="color:red">ENDRECORD</span>

DeMOSS, Circuit Judge, dissenting in part:

I concur fully in the foregoing opinion as to Parts I, II, and IV. I cannot concur in Parts III or V. I write to set forth the reasons for my dissent.

As the majority opinion indicates, there was a critical factual issue in this case: whether Snyder had a gun and pointed it at Trapagnier before Trapagnier shot Snyder in the back. Regrettably, the jury was not posed that specific question; if it had been given that question the resulting answer would have resolved the ambiguity and inherent conflict in the jury's other findings. Since the majority opinion does not set forth the specific interrogatories that the jury answered, I do so in a footnote.[13]

I am in complete and fundamental disagreement with the

---

[13]

1. Do you find that Officer Sidney Trepagnier deprived James Snyder's [sic] of his constitutional rights by using excessive force in arresting him?

Yes __X__        No _____

If your answer to question 1 is "yes," continue on to the remaining questions. If your answer to question 1 is "no" then sign and date this form and return to the courtroom.

2. Do you find that Officer Sidney Trepagnier had a reasonable belief that his actions would not violate James Synder's [sic] constitutional rights?

Yes __X__        No _____

3. Do you find that the constitutional deprivation was caused by a governmental custom, policy, practice or decision of the City of New Orleans?

Yes __X__        No _____

majority's conclusion that there is no inherent conflict between a finding of excessive force (jury interrogatory no. 1) and a finding of qualified immunity (assumptively jury interrogatory no. 2). A finding that Trepagnier used excessive force in arresting Snyder necessarily involves a determination that the force used by Trepagnier (shooting Snyder in the back at a range of 6 to 10 inches) was "objectively unreasonable." However, absent some lawful justification, no reasonable police officer could reasonably believe that shooting a suspect in the back from a distance of 6 to 10 inches would not violate that individual's constitutional rights. In this case, the jury's answer to interrogatory no. 2 necessarily means that the jury found that Trepagnier reasonably believed that his actions were "objectively reasonable," a finding which is in direct conflict with the opposite finding in interrogatory no. 1. As the Tenth Circuit so cogently put it in *Street v. Parham*, 929 F.2d 537, 540 (10th Cir. 1991):

> No officer could reasonably believe that the use of unreasonable force did not violate clearly established law. Once the jury concluded that, even under all the circum-stances, excessive force had been used, the inquiry was over. This is one of the rare instances where the determination of liability and the availability of qualified immunity depend on the same findings. The qualified immunity question was answered as part of the jury's consideration of the excessive force claim. *See **Dixon v. Richer**, 922 F.2d 1456, 1463 (10th Cir. 1991).

I would additionally point out that interrogatory no. 2 is defective because it asks whether Trepagnier had a "reasonable belief," and not whether a "reasonable officer" would believe that his actions would violate Snyder's constitutional rights. The

**24**

Supreme Court has made clear that the determination as to the reasonableness of the officer's use of force must be based on an objective and not subjective determination. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Consequently, I believe the proper disposition of this case is to reverse the trial court's judgment granting Trepagnier the benefit of qualified immunity and remand the case for a retrial of Snyder's claims against Trepagnier. Upon retrial, the trial court should, in my view, require the jury to make the factual determination of whether or not Snyder had a gun and pointed it at Trepagnier, or structure the interrogatories in a manner that requires the jury to find that the force used by Trepagnier was either "objectively unreasonable" or "objectively reasonable" under all the circumstances.