IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-20112
_____

KAREN HUNTER LEKWA, Individually and as
Next Friend of Epiphany Akhimien Lekwa and
Nnate Lekwa, Minors; EPIPHANY AKHIMIEN
LEKWA; NNATE LEKWA,

Plaintiffs-Appellants,

versus

CITY OF HOUSTON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-97-CV-1532)
_____

June 23, 1999

Before JOLLY, DUHÉ, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]


This 42 U.S.C. § 1983 appeal arises from an incident of
excessive force by Lisa D. Allen, a police officer for the City of
Houston, Texas, who had a record of abusive conduct toward
citizens.  In the case before us, Allen beat Karen Hunter Lekwa,
the plaintiff-appellant, with her police-issued flashlight during
a family disturbance call.  We are called on to determine whether
the district court erred in absolving the City of Houston of
liability for this assault under both § 1983, and the Texas Tort

_____

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Claims Act.  Lekwa, individually, and on behalf of her children, contends that the City is liable because her assault was a result of a decision by Police Chief Samuel M. Nuchia that was deliberately indifferent to her Fourth Amendment rights--to wit, the decision to withdraw Allen as a candidate for the Personnel Concerns Programs (for behavioral improvement) in order to facilitate a settlement in Allen's employment discrimination suit against the City.  The district court concluded that Lekwa had not raised a genuine issue of material fact, which if resolved in her favor, would establish that Chief Nuchia's decision to remove Allen was made with deliberate indifference.  The district court further concluded that Lekwa and the children's claims against the City under the Texas Tort Claims Act were precluded by the intentional tort exception to the Act.  For the reasons that follow, we affirm the district court's grant of summary judgment in the favor of the City.

I

A

The facts of this appeal relate first, to Allen's record as a police officer for the City of Houston, Texas, and, second, to the manner in which Allen responded to a "Family Disturbance/Weapon Involved" call at Lekwa's residence.  We turn first to Allen's personnel history.

In August of 1992, Lisa D. Allen became a police officer for the City of Houston.  As early as 1994, Allen had been investigated

2

by the Internal Affairs Division of the Houston Police Department no less than four times for a number of citizen-initiated complaints. Furthermore, Allen's fellow officers were reluctant to handle police calls with her, and even more hesitant to provide her back-up assistance. Allen had a reputation for being combative and overly aggressive with complainants--she was known, according to some officers, for "pouring gasoline on a fire." Allen also remained in constant conflict with particular supervisors in her chain of command, especially Lieutenant Bruce D. Williams.

Over time, Allen's supervisors believed that she was in need of corrective behavioral training. On July 14, 1994, Sergeant C. S. Bloomberg wrote Samuel M. Nuchia, the then chief of police of the Houston Police Department. Sergeant Bloomberg advised Chief Nuchia, inter alia, that because of Allen's "recurring negative performance patterns, and her problems interacting with the public" she should be evaluated for placement in the Personnel Concerns Program.[1] Three other of Allen's superiors, Lieutenant Bruce D.

[1]The Personnel Concerns Program involves administrative procedure to identify negative behavioral patterns in police officers, and a program to assist the officers' supervisors in developing strategies to reverse these patterns. The Personnel Concerns Program is a step-oriented process. Either a supervisor, via the chain of command, or the chief of police identifies an officer for placement in the program. The Personnel Concerns Unit then conducts an investigation of the officer's employment history. The results of the investigation are reduced to a Personnel Concerns Report that is forwarded to the Personnel Concerns Committee. Based on the information contained in the report, the Personnel Concerns Committee makes a recommendation to the chief of police as to whether the officer should be required to enter the program. If the Personnel Concerns Committee believes that the

Williams, Captain T. A. Bullock, and Assistant Chief T. W. Shane, shared Sergeant Bloomberg's concern, and endorsed the recommendation letter.

Chief Nuchia promptly acted on Sergeant Bloomberg's recommendation. On August 10, 1994, the Chief forwarded Sergeant Bloomberg's memorandum to the Personnel Concerns Unit, and instructed the unit to evaluate Allen's work performance. The execution of this order, however, was hardly immediate because of other concerns relating to Allen.

On August 31, 1995, Sergeant Charles D. Williams, of the Personnel Concerns Unit, and Assistant Chief Joe L. Breshears, then head of the Personnel Concerns Committee, met with Sergeant Will Robertson and Sergeant Michael Dirden, an attorney from the Legal

---

officer's behavioral problems are psychological, then the officer may be referred to the Administrative Personnel Committee for further psychological evaluation. In any event, the chief of police makes the final decision as to whether an officer is placed in the Personnel Concerns Program. Upon the chief's recommendation, the officer remains in the program for one year. During this year, close supervision, individual monitoring, and strict reporting of the officer's work-related activities are required. In most instances, the officer is left in his current post or assignment, and he continues to report to his first-line supervisor. Specific attention is paid, however, to the behavioral problems identified in the Personnel Concerns Report. If appropriate, the officer completes specialized training in the problem areas. During the twelve-month period, the officer's immediate supervisor completes weekly evaluations, and conducts weekly counseling meetings. The Personnel Concerns Unit contacts the officer's supervisor weekly for work performance reports, and holds monthly meetings with the officer to discuss the progress made in the program. A monthly report of the officer's progress is forwarded to the chief of police. See Houston Police Department, General Order # 30024 (issue date: June 9, 1993).

Services Unit of the Houston Police Department. The purpose of the meeting was to discuss whether Sergeant Bloomberg's recommendation should be acted upon, in the light of certain legal developments.

Earlier, on or about August 5, 1994, Allen had filed complaints against the City of Houston with both the Equal Employment Opportunity Commission ("EEOC"), and the Texas Commission on Human Rights. Allen's attorney, Murray Malakoff, had informed Dirden that the complaints were administrative precursors to a Title VII, gender discrimination suit against the City. Malakoff further stated that one of Allen's charges of discrimination related to Bloomberg's recommendation, and that her deferral from the Personal Concerns Program could facilitate a settlement of a suit.

During the August 31, 1994 meeting, the three officers and the one attorney agreed that because Allen had complained that Sergeant Bloomberg's recommendation was discriminatory, her subsequent placement in the Personnel Concerns Program would be perceived as retaliation. The group also agreed that the concerns raised in Sergeant Bloomberg's recommendation were personality-oriented rather than disciplinary-oriented. Thus, the general consensus of the group was that a change in supervision would be the best course for getting Allen "on the right track." In the light of these considerations, Dirden, as legal counsel for the Houston Police Department, concluded that it would be best to offer Allen a settlement agreement: If Allen agreed to drop her discrimination

5

charges, she would be permitted to transfer to any unit within the South or Westside Command of the Houston Police Department. If Allen accepted the transfer, she would not be investigated by the Personnel Concerns Unit. If Allen refused to transfer, however, the Personnel Concerns investigation would move forward.

Next, Dirden contacted Chief Nuchia, and informed him of Allen's discrimination charges, and the terms of the proposed settlement agreement. Dirden further advised the Chief that offering Allen a transfer, and electing to forego the Personnel Concerns investigation was the best action to take to prevent her from pursuing the discrimination charges further. Chief Nuchia agreed, and ratified the proposed settlement agreement. Sergeant Williams made a notation to Allen's personnel file dated August 31, 1994, which documented the terms of the proposed settlement. Thus, as of August of 1994, Allen was no longer a candidate for the Personnel Concerns Program. This information, however, was not effectively communicated to the Personnel Concerns Unit. The Unit ultimately proceeded with its investigation of Allen some thirteen months later. The reason for the delay or for the timing of the investigation is not clear from the record before us.

Thus, on September 26, 1995, Allen was instructed to appear at an employee notification meeting conducted by Officer Edna Neal, an investigator for the Personnel Concerns Unit. The purpose of the meeting was to inform Allen of the imminent investigation. Neal offered only one explanation for the thirteen-month delay--Allen's

6

then pending discrimination suit against the City and Lieutenant Williams.[2] Neal officially started the investigation on September 30, 1995, only to have the administrative process derailed for a second time.

When Dirden learned that the Personnel Concerns Unit had proceeded with the investigation, he contacted Chief Nuchia. Dirden reiterated the terms of the August 31, 1994 proposed settlement to the Chief, and advised him to stop the investigation. Consequently, in a letter dated October 27, 1995, Chief Nuchia advised the Personnel Concerns Unit that Allen was no longer a candidate for the Personnel Concerns Program. By this time, Neal's investigation of Allen was substantially complete. She had compiled a Personnel Concerns Report on Allen. When the Chief withdrew Allen as a candidate for the program, however, he was neither aware of the Personnel Concerns Report, nor its contents. Although the Chief was guided by legitimate departmental concerns, the manner in which he attempted further settlement of Allen's discrimination suit would not be without its consequences.

B

---

[2]Notwithstanding the proposed settlement agreement, on September 12, 1994, Allen filed an employment discrimination suit in the district court of Harris County, Texas, against the City of Houston and Lieutenant Bruce D. Williams. She alleged, inter alia, that because of Williams's discriminatory and retaliatory personnel actions, she suffered "psychological injuries . . . and severe mental anguish requiring treatment by health care providers and medication." The district court granted summary judgment in favor of the City, which was not appealed.

Early in the morning hours of November 23, 1995, precisely at 2:58 a.m., several officers from the Houston Police Department responded to a "Family Disturbance, Weapon Involved" call at Karen Lekwa's residence. Shannon Bennett, Lekwa's neighbor, alerted the authorities when she found Lekwa sitting in a puddle of water, screaming hysterically, as she held her two children. Lekwa also mumbled incoherently, and made hand gestures that suggested that a gun had been placed to her head.

Officer Ronny S. Cortez arrived on the scene first. Lekwa initially alleged that she and her two children, Epiphany Akhimien Lekwa and Nnate Lekwa, had been kidnaped at gunpoint by Lawrence Eruvwetere's ex-wife. Eruvwetere was Lekwa's paramour. After confirming from Lekwa that the alleged suspect had left the scene, and that the gun was no longer on the premises, Cortez radioed the dispatcher, and advised her to slow the other units down. Cortez explained that the situation was under control, and no weapon was involved. As Cortez turned to question Eruvwetere, Officer Eric M. Johnson arrived on the scene, followed by officers Charles K. Overstreet and Tracie D. Mosley. After a quick briefing, the officers all agreed that the situation had been sufficiently neutralized, so that the disturbance call could be used to further train Mosley, a new patrolman.

Allen was the last officer to make the scene. Upon her arrival, Allen immediately assumed that Lekwa was the suspect, and approached her in a confrontational manner. Cortez quickly

8

intervened, and briefed Allen. Cortez told her that the disturbance call was under control, that Lekwa was the complainant, and that she was unarmed. Allen's initial hostile reaction to Lekwa was only a prelude to the conduct that followed.

As the investigation progressed, the officers determined that Lekwa had lied about being kidnaped to protect Eruvwetere, who had previously assaulted her while brandishing a gun. Mosley further sensed that Lekwa was afraid to speak truthfully in Eruvwetere's presence. Therefore, to "get the real story," Mosley escorted Lekwa approximately twenty-five feet away from the scene. Lekwa remained quite emotional at this time, and continued to cry. She carried her four-year-old daughter in her arms, and her son stood at her side.

As Mosley continued to question Allen about Eruvwetere and the gun incident, Allen walked hurriedly toward Lekwa, and immediately started to frisk her. Allen grabbed Lekwa by the shirt and told her to "calm down" or she would take her "f------ a-- to jail." Allen then asked Mosley had she searched the suspect. Mosley reiterated that Lekwa was not the suspect, but the complainant. Notwithstanding Mosley's clarification, Allen grabbed Lekwa, who pulled away in resistance. A struggle ensued whereby Allen placed Lekwa in a choke-hold. Lekwa had difficulty breathing, and broke the choke-hold by biting Allen's left thumb. In retaliation, Allen beat Lekwa with her police-issued flashlight, striking her repeatedly over the head ten to fifteen times. Allen also yelled

9

several more profane words at Lekwa.  During the course of the assault, Lekwa dropped her daughter.  She made no effort, however, to defend herself, other than attempting to shield her head from Allen's blows.

The beating ended with Allen arresting Lekwa for resisting arrest, and aggravated assault on a peace officer.[3]  The officers at the Houston City Jail refused to admit Lekwa, however, because of her head injuries.  Lekwa was then transported to the Ben Taub Hospital.  She suffered a small midline bifrontal scalp hematoma from the assault, and bruises to her hands.

II

A

On January 9, 1996, Mosley reported the Lekwa incident to the Internal Affairs Division.  Allen was placed on "relieved of duty" status pending the outcome of a formal investigation into the incident.  The internal affairs investigation concluded that: (1) Allen subjected Lekwa to official oppression in violation of Texas Penal Code § 39.03; (2) Allen violated § 2.3 of the Houston Police Department Rules Manual when she used profanity while speaking to and about Lekwa; and (3) Allen made false statements to the Internal Affairs Division regarding the assault in violation of

---

[3]Allen later filed criminal charges against Lekwa for aggravated assault of a peace officer.  The Harris County District Attorney dismissed the charges on January 25, 1996.

§ 2.6 of the Rules Manual.  Consequently, on June 4, 1996, Allen was terminated from the Houston Police Department.

Allen's use of excessive force against Lekwa also resulted in a criminal prosecution.  On August 12, 1996, Allen was indicted on one count of aggravated assault with a deadly weapon, a third degree felony offense, and one count of official oppression.  On October 3, 1996, Allen plead nolo contendere to the charges.  She received a sentence of ten years probation and 250 hours of community service.

B

Some five months prior to Allen's sentencing, on April 30, 1996, Lekwa, individually, and as next friend of her children, sued the City of Houston, and Allen.  In her complaint and amended complaint, Lekwa alleged, inter alia, a claim for excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983, and a claim for negligent supervision under the Texas Tort Claims Act.  On the behalf of her children, Lekwa alleged by-stander liability, and claims for the loss of parental consortium.

The City removed the action to the United States District Court for the Southern District of Texas on May 2, 1997, based on federal question jurisdiction.  The City then moved for summary judgment on December 1, 1997.

11

On January 20, 1998, the district court granted the City's motion for summary judgment.[4] Citing <u>Board of County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397 (1997), the district court concluded that there existed no evidence from which a reasonable juror could conclude that the City, through its policy maker, Chief Nuchia, acted deliberately indifferent to Lekwa's Fourth Amendment rights when it transferred Allen to another police command, rather than place her in the Personnel Concerns Program. Regarding the negligent supervision claim, the district court concluded that the harm the plaintiffs suffered, if any, was caused by Allen's intentional assault, an action for which the City of Houston had not waived its governmental immunity under the Texas Tort Claims Act. Tex. Civ. Prac. & Rem. §§ 101.021(2) and 101.057(2).

The district court entered final judgment in the case on January 30, 1998. On February 8, 1998, Lekwa filed a timely notice of appeal.

After a review of the summary judgment record, we are satisfied that the district court did not err in dismissing Lekwa and the children's claims, as a matter of law, under the Texas Tort Claims Act.[5] We likewise find that the children have no cognizable

---

[4]Upon the district court's grant of summary judgment in favor of the City, Lekwa, in accordance with Fed.R.Civ.P. 41(a)(2), successfully moved the district court to dismiss her claims against Allen on January 22, 1998.

[5]Under the Texas Tort Claims Act, a municipality is immune

claim for bystander liability against the City of Houston under

§ 1983.  <u>Grandstaff v. City of Borger, Texas</u>, 767 F.2d 161, 172

(5th Cir. 1985).  We therefore turn to address the remaining issue

in this appeal--the City's liability for Lekwa's § 1983 claim and

her children's derivative claim for loss of parental consortium.

III

---

from suit for claims arising out of intentional torts.  § 101.057
(2).  An injured party can pursue a claim for negligent supervision
arising out of the same set of facts, however, <u>Holder v. Mellon
Mortg. Co.</u>, 954 S.W.2d 786, 805 (Tex. Civ. App.--Houston [14th
Dist.] 1997) (citations omitted), but only where the "focus" of the
claim is on the municipality's negligent supervision, not the
intentional conduct of its employee.  <u>Medrano v. City of Pearsall</u>,
No. 04-98-00698-CV, 1999 WL 43649,*3 (Tex. Civ. App.-San Antonio
1999) (citations omitted).  Indeed, the Texas Supreme Court had
made clear that the intentional tort exception cannot be
circumvented with the mere allegation that a municipality
negligently supervised its employee-tortfeasor.  <u>Delaney v.
University of Houston</u>, 835 S.W.2d 56, 60 (Tex. 1992).  The
plaintiff must also establish a causal nexus between the employee's
use of the municipal property, and the municipality's alleged
negligent conduct.  <u>Holder</u>, 954 S.W.2d at 807.  We find that the
summary judgment record is void of even a scintilla of proof from
which a reasonable jury could infer the required causal nexus
between Allen's misuse of the flashlight, and the City's purported
negligent supervision.  <u>See</u> <u>id.</u>  Indeed, the record makes clear
that the injuries Lekwa sustained on November 23, 1994, were caused
solely by Allen's intentional assault.  We therefore conclude that
the district court properly dismissed Lekwa's negligent supervision
claim, and the children's derivative claim for loss of parental
consortium.  Even treating the children's bystander claim as a
direct claim under Texas law, <u>see</u> <u>Harris County v. White</u>, 823
S.W.2d 385, 388 (Tex. Civ. App.--Texarkana 1992), we hold that the
claim is likewise precluded by the intentional tort exception,
§ 101.057(2).

Because this § 1983 appeal is before us on the district court's grant of summary judgment in favor of the City, we review the record de novo. To survive the City's motion, Lekwa must demonstrate that under the stringent standards of culpability, and causation articulated in Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397 (1997), there exists sufficient evidence to support a jury's verdict in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55 (1986). For the purposes of summary judgment, Lekwa's proffered evidence is to be believed. Id. at 255. Thus, we will draw all justifiable inferences from the evidence in the light most favorable to her. Id.; Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49 n.5 (1990) (citations omitted).

IV

Section 1983 provides a claim against every person who, under the color of state law, deprives another of his or her federally protected rights. 42 U.S.C. § 1983; Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120 (1992). It has long been the rule that a municipality qualifies as a "person" for the purposes of § 1983. Id. (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690 (1978)). However, a municipality is not liable under § 1983 solely because one of its employees has committed a constitutional tort. Monell, 436 U.S. at 691; Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998), cert. granted in part, 119 S.Ct. 863 (1999), and cert. dismissed, 119 S.Ct. 1493

14

(1999). Stated differently, a municipality cannot be held liable under § 1983 on a theory of respondeat superior. Id. Rather, municipal liability attaches under the federal statute only when the execution of an official municipal policy or custom causes a constitutional injury. Collins, 503 U.S. at 123 (citing Monell, 436 U.S. at 694); Snyder, 142 F.3d at 795 (internal quotations and citations omitted). This standard of liability applies equally to municipal policies that are facially unconstitutional, as well as to those policies that are facially valid. Collins, 503 U.S. at 123 (citations omitted). The law is further clear that an isolated decision tailored to a particular situation, but not intended to control later situations constitutes a "policy" for the purposes of § 1983 provided the decision was made by an authorized policymaker, who had final authority with respect to the action ordered. City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (citations omitted); Bennett v. Pippin, 74 F.3d 578, 586 (5th Cir. 1996), cert. denied, 519 U.S. 817 (1996)(citations omitted).

Thus, in cases such as the instant matter, where a facially valid decision by an authorized policymaker, i.e., the municipal policy, is alleged to have resulted in the deprivation of the plaintiffs' federally protected rights, to fasten § 1983 liability on the municipality, the plaintiffs must show that: (1) the municipal policy was adopted with "deliberate indifference" to the plaintiffs' constitutional rights (culpability); and (2) the municipal policy was the "moving force" behind the plaintiffs'

constitutional injury (causation).  <u>Snyder</u>, 142 F.3d at 795.  <u>See also</u> <u>Bryan County</u>, 520 U.S. at 404-05.  With these principles as a guide, we turn to the summary judgment record before us.

V

A

In this case, it is undisputed that the City of Houston, Texas Police Department had an established policy of investigating "problem" officers, and then requiring the identified officer to undergo corrective behavioral training vis-à-vis the Personnel Concerns Program.  This § 1983 appeal poses the question of the City's liability for Chief Nuchia's decision to forego this administrative process after the identified officer (Allen) brought suit against the City challenging, <u>inter alia</u>, her placement in the program.  Thus, although her brief wanders from time to time, as we understand Lekwa's theory of liability, the City, through its policymaker, Chief Nuchia, acted deliberately indifferent to her Fourth Amendment rights, when, in an effort to settle Allen's 1994 employment discrimination suit, Chief Nuchia withdrew Allen as a candidate for the Personal Concerns Program.  In doing so, it is asserted that Chief Nuchia consciously decided to leave Allen on the street--essentially as a cost of protecting the police department from a lawsuit--notwithstanding his knowledge of her psychological problems, and pattern of abusive conduct toward citizens such as Lekwa.  This decision may have been in the best interest of the police department, the argument goes, but it was

16

deliberately indifferent to the right of citizens, including Lekwa, to be free from excessive force.  Lekwa therefore contends that Allen's use of excessive force against her was a predictable consequence of the Chief's decision to withdraw Allen from the program.

Even if we assume, without deciding, that a jury could reasonably find that the City of Houston was deliberately indifferent in facilitating settlement of Allen's discrimination claim without considering the effect of Allen's conduct on Lekwa and other Houston citizen's Fourth Amendment rights, still, we cannot say that the district court erred in granting summary judgment in favor of the City.  We find that Lekwa's § 1983 claim and, in turn, the children's derivative claim for loss of parental consortium, is foreclosed by her failure to create a triable issue on the second essential element of her case--the causation requirement.  We therefore direct our inquiry to this evidentiary shortcoming.[6]

B

Lekwa's theory of causation is based on the assertion that if Allen had been placed in the Personnel Concerns Program, she would have been relieved of her duties as a street patrolman during the course of her behavior modification training.  The reasoning

---

[6]Our disposition of this appeal on the cause-in-fact requirement makes it unnecessary for us to reach the related issue of proximate cause.

17

continues, "but for" Chief Nuchia's wilful decision not to follow the usual administrative policy of referring Allen to the Personnel Concerns Program--a decision that was deliberately indifferent to Houston citizens' Fourth Amendment rights--Allen would not have been in a position to apply excessive force to Lekwa. Thus, the violation of Lekwa's Fourth Amendment right to be free from excessive force was caused by the Chief's decision to take Allen out of the Personnel Concerns Program, knowing (as he did) of her proclivity for violence.

C

In Bryan County, 520 U.S. at 405 (citations omitted), the Supreme Court reaffirmed its earlier precedent that the causation requirement under § 1983 is a "rigorous" standard of proof, which requires the plaintiff to establish a direct causal link between the municipal policy, and the alleged constitutional injury. See, e.g., City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 n.8 (1985) ("moving force" requires an affirmative link between the policy and the particular constitutional violation alleged); City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("first inquiry . . . under § 1983 . . . is whether there is a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation"). See also Faire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir. 1992) (citations omitted) ("municipal policy must be

18

affirmatively linked to constitutional violation to be moving force behind it"). Specifically, the plaintiff must establish that the municipal policy (here, a specific decision by an authorized policymaker) was the cause-in-fact of the injury, that is, that the municipal policy served as the moving force behind the constitutional violation at issue, or that the plaintiff's injuries resulted from the execution of the policy. <u>Spiller v. City of Texas City Police Department</u>, 130 F.3d 162, 167 (5th Cir. 1997) (internal citations and quotations omitted).

Regarding the cause-in-fact requirement, the Supreme Court has further clarified that mere generalized conduct on the behalf of a municipality, remote in either consequence or time, is insufficient to carry the plaintiff's burden: "Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense: But for the municipality's decision to hire the employee, the plaintiff would not have suffered the injury. [Thus,] to prevent municipal liability. . .from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision [here, the decision to remove Allen as a candidate for the behavioral improvement program], and the particular injury alleged [here, Allen's use of excessive force against Lekwa in the violation of her Fourth Amendment rights]." <u>Bryan County</u>, 520 U.S. at 410. We thus require the plaintiff to present specific facts, from which reasonable and fair-minded jurors would agree, that the execution

19

of the municipal policymaker's decision directly resulted in her constitutional injury. Spillers, 130 F.3d at 167. Accordingly, a high level of proof is required to establish the cause-in-fact requirement; the causal showing must be strong. See Snyder, 142 F.3d at 796.

Applying these standards, we find that Lekwa's theory of causation is based on an erroneous assumption, and, consequently, her summary judgment evidence falls short of establishing the requisite causal link. After a thorough review of the record, including, General Order 300-24, which sets forth the Personnel Concerns Program, we find no evidence that Allen's placement in the program would have resulted in her being removed from active duty.[7] To be sure, the plain language of the Order makes clear that the officer's continued arrests, and related activities are used to monitor her progress in the program. There is no evidence in the record to show Allen would have been an exception to this general rule. Thus, Lekwa and the children's theory of causation

---

[7]Houston Police Department General Order 300-24 provides, in relevant part:

*In most instances, the employee will be left in [her] current assignment and [will] continue to report to [her] first-line supervisor . . .* In some cases it may be determined that either the first-line supervisor or the employee's present assignment may be part of the problem. If this determination is made, the PCU may move the employee to an appropriate shift and assignment for completion of the PCP, with the approval of the Chief of Police. . . .

(Emphasis added.)

collapses. The evidence just does not fit the theory of the plaintiffs' case; this is not a case where the chief failed to follow a policy that would have taken a known bad cop off the streets. Even if Allen had been placed in the behavior improvement program, she--as far as this record shows--would still have been on the streets. Therefore, Lekwa and her children's purported constitutional injuries have no cause-in-fact link to the policymaker's decision as required by the case authority we have earlier cited. Consequently, the City of Houston cannot be held liable for Allen's conduct.

Moreover, because of her repeated emphasis on the nuances of the Personnel Concerns Program, and what the City "could have done" to alleviate the risk that Allen would react violently to the citizens she encountered, Lekwa's causation argument invites an inference specifically rejected by the Supreme Court in City of Canton, 489 U.S. at 391-92. In the context of a § 1983 failure-to-train case, the Canton Court explained that virtually every case in which a municipal employee has inflicted a constitutional injury upon a plaintiff, the § 1983 plaintiff will be able to point to something the City "could have done" to prevent the incident. Id. at 392. The Court cautioned, however, that such a lesser standard of causation would result in de facto respondeat superior liability on municipalities--a result rejected in Monell, 436 U.S. at 693-94. Therefore, guided by the necessity of distinguishing between direct and vicarious liability under § 1983, the Canton Court emphasized

that it will not suffice to show that the plaintiffs' constitutional harm could have been avoided if the officer had been better trained to avoid the particular injury-causing conduct. <u>Canton</u>, 489 U.S. at 392. Indeed, the § 1983 plaintiff "must still prove" that a municipal policy "actually caused" her constitutional harm. See <u>id.</u> In the light of <u>Canton</u>, Lekwa's summary judgment proof hardly provides a sufficient basis on which to present her § 1983 claim to the jury.

                                   VI

In sum, we must take this § 1983 case in the factual posture in which it has been presented. In the light of the structure of the Personnel Concerns Program, which leaves the officer in her current assignment, Lekwa's proof of causation becomes largely a matter of speculation and conjecture. We thus agree with the district court that summary judgment in favor of the City of Houston was appropriate.

For the reasons in this opinion, the district court's grant of summary judgment in favor of the City on Lekwa and her children's claims under § 1983 and the Texas Tort Claim Act is in all aspects
                                        A F F I R M E D.[8]

---

[8]Judge Emilio M. Garza concurs in the judgment only.

22