672 So.2d 665 (1996)
STATE of Louisiana ex rel. James T. JACKSON
v.
C. Paul PHELPS, et al.
No. 95-C-2294.
Supreme Court of Louisiana.
April 8, 1996.
Rehearing Denied May 10, 1996.
James Winston Ardoin, Ardoin & Daigle, Eunice, for Applicant.
Richard P. Ieyoub, Attorney General, John H. Ayres, III, Asst. Attorney General, Baton Rouge, for Respondent.
MARCUS, Justice.
James T. Jackson, an inmate at Dixon Correctional Institute (DCI) in Jackson, Louisiana, filed suit against C. Paul Phelps, Director of Louisiana Department of Corrections; Burl Cain, Warden of DCI; Colonel Donald McNeal, Chief of Security at DCI; and the State of Louisiana to recover damages for injuries he sustained when another inmate cut his throat and stabbed him. Plaintiff alleged that defendants were negligent in failing to offer reasonable protection from the danger of armed attacks by fellow inmates. Following trial, the commissioner issued a recommendation to the district court in favor of the plaintiff.[1] The commissioner found the State liable because the State failed its duty to maintain a safe environment free of dangerous instrumentalities which could be used against unsuspecting and unprotected inmates. He recommended dismissal *666 against all other defendants. The trial judge, following the recommendation of the commissioner, rendered judgment in favor of the plaintiff and against the State in the amount of $75,000 plus legal interest and costs. The State appealed.
The court of appeal, with one judge dissenting, affirmed the finding of liability on the part of the State as well as the award of damages in an unpublished opinion. Upon the State's application, we granted certiorari to review the correctness of that decision.[2]
At the time of the incident, plaintiff was incarcerated at DCI in a minimum security unit. On the evening of March 28, 1986, plaintiff was watching television with other inmates in the TV room adjacent to his dormitory. Shortly after ten o'clock, plaintiff felt a hand grabbing the top of his head and a sharp object going around his throat. Plaintiff pulled away from his attacker and was then stabbed in the stomach. During the ensuing struggle, plaintiff received lacerations on the abdomen, chest, shoulder, and forearm in addition to the almost circumferential laceration on his neck. Prison officials responded to the disturbance and separated plaintiff from his attacker, inmate James Smith. Smith received a cut on his left arm. Plaintiff was taken to a local hospital where doctors sutured his wounds.
The weapon used by Smith was manufacturednot handmade. Although the weapon was not introduced into evidence, witnesses testified that it was either a box-cutting knife or a leather-working tool. The weapon was five to seven inches in length overall with a short retracting blade one and one-half inches to two inches long. Prison employees used box-cutting knives in the mail room to open packages. DCI allowed certain inmates to use leather-working tools in the prison's hobby shop. Smith was among the inmates assigned to the hobby shop and was seen by another inmate using a knife to cut leather in the hobby shop on the night before the attack.
At the time of the attack, DCI was a medium-minimum security facility with minimum security dormitories and cell blocks for more dangerous inmates. Security officers made rounds through the dormitory, TV lounge, and hobby shop four to five times per hour. Guards would periodically shakedown inmates and their belongings to search for contraband such as weapons, drugs or alcohol. The prisoners' hobby shop tools were kept in lock boxes which were subject to random inspection. The hobby shop was locked when not in use. Only the inmates assigned to the hobby shop were allowed in the shop. If an unauthorized inmate was found in the hobby shop, officers would discipline him for being in an unauthorized area. On the night of the incident, two security officers were in the bullpen adjacent to the TV room and were first to arrive at the scene. The two guards on patrol also heard the commotion and went immediately to the TV room where they assisted in separating the two inmates.
At the time of his injury, plaintiff was 30 years old and was serving a sentence for first degree robbery. Smith was 22 years old, 5'8" tall and weighed 160 pounds. Smith was serving a 17 year sentence for manslaughter, his first offense. Plaintiff never told DCI officials that he was in fear of being attacked by Smith. Plaintiff testified that he had not provoked Smith prior to the attack. However, Smith testified that plaintiff had been trying to force him into being his punk.[3] Prison officials had no notice prior to the incident of any animosity between plaintiff and Smith.
The issue presented for our review is whether the State is liable for plaintiff's injuries.
In order to determine whether liability exists under the facts of a particular case, our court has adopted a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to plaintiff, the *667 requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993). While a penal institution is not an insurer of an inmate against attacks by other inmates, penal authorities have a duty to use reasonable care in preventing harm after they have reasonable cause to anticipate it. Breaux v. State, 326 So.2d 481, 482 (La.1976); Parker v. State, 282 So.2d 483, 487 (La.), cert. denied, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). Whether the state breached its duty will depend on the facts and circumstances of each case. Manasco v. Poplus, 530 So.2d 548 (La.1988). Thus, we must determine whether the penal authorities at DCI had reasonable cause to anticipate harm to plaintiff and, if so, whether they failed to use reasonable care in preventing such harm.
The record in this case clearly establishes that the penal authorities at DCI had no reasonable cause to anticipate harm to plaintiff. Smith's attack on Jackson came without warning to Jackson and prison officials. The warden testified that if he had known that Jackson and Smith were enemies, he would have kept them apart. The chief of security testified at trial that when a prisoner feels at risk from attack by another inmate, the prisoner can request to be placed in administrative lockdown. Jackson never notified the institution that he was in fear of being attacked by Smith and never requested separation from Smith. Jackson claimed to have done nothing to provoke Smith. According to Jackson, he had no warning prior to the incident that Smith intended to harm him. A fellow inmate who testified on plaintiff's behalf said that he never saw Smith and Jackson argue or even hold conversations. The evidence indicates that no one anticipated any difficulty between Jackson and Smith. The attack appeared to be spontaneous and unprovoked.
Neither Jackson nor Smith had reputations for violence at DCI. At trial, Jackson claimed to have had only sixteen "write-ups" in the eight years of his incarceration in Louisiana penal institutions. Jackson had also been incarcerated in Texas where he was convicted of aggravated promotion of prostitution. Smith's prison conduct report listed seven separate incidents involving defiance, disobedience, and fighting during the one year period prior to his attack on Jackson. Based on the testimony and evidence presented in this case, we find that the penal authorities at DCI had no reasonable cause to anticipate harm to plaintiff. Accordingly, we do not reach the issue of whether they failed to use reasonable care to prevent such harm.
Under the facts and circumstances of this case, we find that the plaintiff failed to prove that the State breached its duty to him. Therefore, the State is not liable to plaintiff for his injuries. The trial judge was clearly wrong in holding otherwise. The court of appeal erred in affirming the judgment of the trial court. Accordingly, we must reverse.

DECREE
For the reasons assigned, the decision of the court of appeal is reversed. Judgment is rendered in favor of the State of Louisiana, and against James T. Jackson, dismissing his suit at his cost.
LEMMON, J., concurs and assigns reasons.
JOHNSON, J., dissents.
LEMMON, Justice, concurring.
The lower courts found the State liable for negligence in permitting unreasonable access to the dangerous instruments in the hobby shop. Such negligence, if proved, would be a basis for liability irrespective of reasonable cause to anticipate harm to a particular inmate. Because the record establishes that the state exercised reasonable care in securing hobby shop tools in a minimum security area of the prison, I concur in reversing the judgments of the lower courts.
NOTES
[1] This case was tried twice. Due to the court reporter's death, the commissioner was unable to obtain a record of the first trial prior to making his recommendation. Upon plaintiff's request, the case was tried again in its entirety before the same commissioner. The parties stipulated to the inclusion of the pleadings and exhibits from the first trial.
[2] 95-2294 (La. 12/8/95); 664 So.2d 410.
[3] "Punk" is prison slang for a young man who is forced into becoming a homosexual by an older inmate. See, The Oxford English Dictionary, Vol. XII, 847 (2nd ed. 1989).