TERRI F. LOVE, Judge.
hThis appeal arises from an inmate’s death during the administration of five-point restraints while in the custody of the Orleans Parish Sheriffs Office. The decedent’s wife filed suit seeking damages for her husband’s death. After a two-day bench trial, the trial court found the defendants 100% liable. The trial court awarded $300,000.00 to the wife for the wrongful death of her husband, $200,000.00 to their child for the wrongful death of her father, and $150,000.00 in survival damages. The trial court also awarded $15,000.00 in 42 U.S.C. § 1983 damages and attorney’s fees pursuant to 42 U.S.C.1988(b). All of the awards were reduced to $500,000.00, pursuant to the statutory cap as outlined in La. R.S. 13:5106. The defendants appeal contending that the trial court erred by concluding that they failed to exercise reasonable care; committed manifest error by concluding an act or omission was the cause-in-fact of the decedent’s death; by failing to allocate a portion of fault to the decedent, by finding 42 U.S.C. § 1983 liability; by failing to grant qualified immunity; and by assessing punitive damages.
We find that the trial court did not manifestly err by finding the defendants liable for the inmate’s death, as the duty to protect the decedent was breached. The 12trial court did not commit manifest error by finding that the defendants were the cause-in-fact of the decedent’s death because the facts and evidence presented show that the decedent’s death was caused by physical restraint. We also find that the trial court did not err by allocating one hundred percent of the fault to the defendants.
However, we find that the trial court erred by finding that the sheriff was liable pursuant to 42 U.S.C. § 1983 because the record was devoid of evidence of a pattern of similar events. We also find that the trial court erred by holding the remaining two defendants liable pursuant to 42 U.S.C. § 1983 because we find they did not act with deliberate indifference. An examination of qualified immunity was preter-mitted, since we reverse the trial court’s findings of 42 U.S.C. § 1983 liability. Lastly, punitive damages are unavailable without constitutional violations; therefore, we vacate the trial court’s $15,000.00 award for punitive damages, as well as attorney’s fees. In all other respects, the judgment of the trial court is affirmed.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Kerry Washington, age 39, was taken into custody on April 25, 2006, by the Jefferson Parish Sheriffs Department after his wife, Cheryl Washington, called the police during a domestic dispute. Mr. Washington was transferred to the Orleans Parish Sheriffs Office (“OPSO”) on April 27, 2006, due to an outstanding warrant, and was incarcerated in the Orleans Parish Prison’s House of Detention (“HOD”).
On April 29, 2006, Mr. Washington was on the third floor of the HOD, known as the receiving floor, when inmates opened the doors of the cells. Mr. Washington was pinned against a television stand by inmates when authorities arrived. The inmates stated that Mr. Washington harmed another inmate by |aclosing the inmate’s hand in a cell door. Mr. Washington and the other injured inmate were taken to the second floor of the HOD to receive medical care. The HOD medical staff stated that Mr. Washington only had some minor scrapes and scratches, so Mr. Washington was taken to the eighth floor, which was the disciplinary floor. Once on the eighth floor, Mr. Washington allegedly began to struggle with OPSO deputies. A deputy pinned Mr. Washington to the floor of a *518 cell wherein Mr. Washington allegedly-proceeded to throw feces onto himself and the deputy holding him down. Additional backup arrived and Mr. Washington was taken to the tenth floor for a psychiatric evaluation. The psychiatric nurse attempted to take Mr. Washington’s vital signs, but he continued to resist. The nurse telephoned the doctor who ordered that Mr. Washington be placed in five-point restraints once he was calm and subdued. While the deputies were attempting to place Mr. Washington in the five-point restraints, someone noticed that he stopped breathing. Mr. Washington was then removed from the restraint bed, and medical treatment was provided. Mr. Washington was then taken to Tulane Hospital where he was pronounced dead.
After Mr. Washington died, Mrs. Washington repeatedly telephoned to try and locate her husband. Mrs. Washington was told that Mr. Washington had been released. Her brother went to OPP to visit Mr. Washington, but was also told that he was released. Mrs. Washington went to OPP on May 12, 2006, and was told that her husband died while in custody. She identified his body on May 15, 2006.
The trial court also awarded Mrs. Washington $15,000.00 in 42 U.S.C. § 1983 damages, as well as attorney’s fees and costs. The Defendants’ timely Motion and Order for Suspensive Appeal followed.
The Defendants assert that the trial court erred by: finding that they failed to exercise reasonable care; concluding that an act or omission was the cause-in-fact of Mr. Washington’s death; failing to allocate a portion of fault to Mr. Washington; finding Sheriff' Gusman liable in his official capacity under 42 U.S.C. § 1983; finding the liability of the other two defendants
Mrs. Washington, individually and in her capacity as representative of the estate of Mr. Washington and Natural Tutor of Ker-rionne Washington, filed a Petition for Damages against Marlin Gusman, individually, and in his official capacity as criminal sheriff for Orleans Parish, contending that the OPSO was |4liable for the wrongful death of Mr. Washington. Mrs. Washington sought damages for “lost wages and benefits, loss of support, loss of consortium, services, and society, pain and suffering.” Mrs. Washington then filed a Motion for a Preliminary Default, which was denied because Sheriff Gusman previously filed an Answer. Mrs. Washington filed a First Supplemental and Amended Petition in order to include Dwayne Washington and Dwayne Wilson, Jr. as additional defendants.
Following a two-day bench trial, the trial court found 100% in favor of Mrs. Washington and against the Defendants in their official capacities for $665,000.00, to be reduced by the statutory cap imposed by La. R.S. 13:5106. The damages awards were separated as follows:
Wrongful death: $300,000.00 — Cheryl Washington
$200,000.00 — Kerrionne Washington
Survival Action: $150,000.00
pursuant to 42 U.S.C. § 1983; failing to grant qualified immunity; and assessing punitive damages.

TRIAL TESTIMONY & EVIDENCE

Cheryl Washington

Mrs. Washington testified that she and Mr. Washington were together for ^nineteen years. She stated that they had a “good relationship” and were “like best friends.” While Mrs. Washington testified that they “got into [sic] altercation” the night Mr. Washington was taken into cus *519 tody, she also testified that they “got a long [sic] good.” Mr. and Mrs. Washington had one child together, Kerrionne. Mrs. Washington stated that Kerrionne and Mr. Washington had a close relationship and that “[t]hey done all kinds of activities together.” Mrs. Washington testified that Mr. Washington’s death “affected [Kerrionne] a lot.” The family took a vacation about once a year.
Mrs. Washington attempted to visit Mr. Washington on April 27, 2006, but was told that Mr. Washington was previously released. Mrs. Washington’s brother went to see Mr. Washington on April 28, 2006. However, he was also told that Mr. Washington was released. Mrs. Washington telephoned OPP about her husband “constantly, every day, [sic] all night.” On May 12, 2006, Mrs. Washington visited OPP to see her husband. She was then informed that Mr. Washington died. Mrs. Washington identified Mr. Washington’s body on May 15, 2006, and contacted Dr. Douglas Posey to conduct a second autopsy. No one at OPP or the OPSO contacted Mrs. Washington about her husband’s death.

Balinda Parker

■ Balinda Parker, Mr. Washington’s sister, telephoned. OPP for three weeks or a month trying to speak to her brother. Ms. Parker stated that the profile of Mr. Washington on the OPP web site indicated that Mr. Washington had been released until the family discovered that he was dead. Then the profile of Mr. Washington was changed to reflect that he was “deceased.” Ms. Parker stated that no one discussed with them how Mr. Washington died. In regards to Kerrionne, Ms. Parker reiterated that Kerrionne and Mr. Washington “did everything together” | (¡because Kerrionne was a “daddy’s girl.”

Nathaniel Holden

Nathaniel Holden, Mr. Washington’s brother-in-law, also went to OPP to see Mr. Washington, and was told he had been released.

Emily Holden

Emily Holden, Mrs. Washington’s daughter that Mr. Washington helped raise, testified that she and Mr. Washington had a “great relationship.” She stated that Mr. Washington “was literally the best dad that any girl can wish for.”

Joseph Gautreaux III, MD

Joseph Gautreaux III, MD, was the doctor on duty in the HOD when Mr. Washington died. Dr. Gautreaux examined inmates at intake, treated injuries at night, and “ran a sick call” for OPP. Dr. Gau-treaux ordered that Mr. Washington be placed in five-point restraints once he was calm and subdued. Dr. Gautreaux explained that Mr. Washington needed to be calm prior to placing him in the five-point restraints to prevent him from breaking a body part while being restrained. He believed that restraint was necessary to complete the psychiatric evaluation. Restraint decisions were made on a case-by-case basis based on his experience. When Dr. Gautreaux arrived on the tenth floor, he saw Mr. Washington on the floor surrounded by people attempting resuscitation. Dr. Gautreaux testified that they did everything they could to resuscitate Mr. Washington, but that the defribulator would not shock Mr. Washington because he had no electrical activity.
Dr. Gautreaux testified that there were no guidelines or protocols that dictated when- an inmate should be placed in five-point restraints and that he never received any training on it. If you attempt to administer five-point restraints on someone that is combative, the person could be smothered. An improperly placed |7chest *520 strap can cause respiratory insufficiency. That is why Dr. Gautreaux ordered that Mr. Washington be placed in restraints once he was calm and subdued. Dr. Gau-treaux did not recall seeing the chest strap on Mr. Washington.
Dr. Gautreaux stated that a chemical restraint is used prior to a physical restraint “[i]f [they] can.” When asked on direct examination by counsel for Mrs. Washington why a chemical restraint was not used on Mr. Washington first, Dr. Gautreaux testified that “[t]o get the tho-razine probably would have taken longer than to try to restrain him and then give him the thorazine.” “If we would have had time,” a shot of thorazine would have been the preferred method of subduing Mr. Washington. However, administering a needle for thorazine is not a safe protocol in all circumstances, like when an inmate is rolling around and being combative.

Death Certificate & Autopsy

Mr. Washington’s death certificate states that his death was an accident that occurred during restraint at the HOD. The injuries and complications that caused his death were listed as: cardiac arrhythmia, respiratory insufficiency, excited delirium, and death during restraint. Mr. Washington’s autopsy revealed that he suffered from the following blunt force injuries:
1.1 Linear contusions and abrasions on the wrists and ankles
1.2 Linear (patterned) contusions with central spacing located on the abdomen, left back and posterior aspect of the left upper arm
1.3 Contusions and abrasions on the shoulders, upper back and lower chest
1.4 Scattered contusions on the knees and left elbow 1.5 Contusions on the forehead and left parietal scalp 1.6 Lacerations on the upper and lower lips with recent loss of the upper left medial incisor
1.7 No obvious fractures or internal organ injuries.
The autopsy also showed that Mr. Washington had acute visceral congestion.
| ¡Douglas Posey, Jr., MD
Douglas Posey, Jr., MD, Mrs. Washington’s expert in forensic pathology and toxicology, was retained to perform a second autopsy on Mr. Washington. His autopsy revealed a number of contusions on Mr. Washington’s wrists, knees, ankles, back, and head. Dr. Posey also found blunt-force injuries on Mr. Washington’s entire body. Dr. Posey testified that “something in a restraint form ... was across [Mr. Washington’s] chest and [was] sufficient enough to rupture the small blood vessels and to contuse and bruise the area.” Dr. Posey stated, “I believe that the visceral congestion was due to the fact that Mr. Kerry Washington died a hypoxic or an anoxic death.”
In regards to the findings of the first autopsy, Dr. Posey believed that Dr. Min-yard’s and Dr. Huber’s findings were incorrect. He testified that cardiac arrhythmia and failure to breathe are not causes of death, but are mechanisms of death. He further stated that excited delirium only occurs when cocaine is present. Mr. Washington did not have cocaine or metabolites of cocaine in his system when he died, indicating that he did not suffer from or die from excited delirium. The blunt-force injuries Mr. Washington sustained “were superficial and insufficient to have caused his death.” Dr. Posey stated that respiratory insufficiency would be present in someone dying from restraint.

Dwayne Washington

Dwayne Washington works as a Lieutenant for the OPSO, and was assigned to the HOD in 2006. Lt. Washington was a *521 tier deputy on April 29, 2006, on the eighth floor. He responded to a call for back-up to the third floor where he said he found Mr. Washington in “a confrontation with a couple of inmates.” Lt. Washington learned that Mr. Washington allegedly smashed another inmate’s hand |flin the cell door, so several other inmates had “jammed [Mr. Washington] up against one of the television stands.” Lt. Washington placed handcuffs on Mr. Washington and escorted him to the medical department on the second floor. The medical department said that Mr. Washington had some minor scrapes and scratches. After being cleared by the medical department, Lt. Washington and Deputy Dwayne Wilson were instructed to take Mr. Washington to the eighth floor, the disciplinary floor. Lt. Washington then removed the left handcuff, “at which time [Mr. Washington] started to put up a big fight.” Lt. Washington struggled with Mr. Washington and they “slid along the wall inside that cell for maybe a good two or three minutes.” Both of them landed on the floor between the wall and the commode of the cell after Lt. Washington kicked Mr. Washington’s feet out from under him. Mr. Washington then threw feces from the commode onto himself and Lt. Washington.[1] Lt. Washington told Dep. Wilson to get back-up. Mr. Washington was placed in leg restraints, recuffed, and taken to the tenth floor, the psychiatric floor. When Mr. Washington was placed on the bed for restraints, he began to fight again.
Lt. Washington assisted in placing Mr. Washington’s left leg in restraints because he was trying to kick. Lt. Washington checked to see if the restraint was too tight and walked out of the cell.[2] At that point, Mr. Washington was still struggling, but stopped a few seconds later. Lt. Washington did not see any sign that Mr. Washington was having trouble breathing because Mr. Washington was “kicking and fighting.” The nurse then had the deputies remove the leg restraints and carry Mr. Washington out of the cell to start emergency medical procedures. |inLt. Washington never observed deputies striking, punching, kicking or laying on top of Mr. Washington.

Kevin Oser

Sergeant Kevin Oser worked as the assistant watch commander at the HOD on April 29, 2006. Sgt. Oser was assigned to the watch office. He accepted a call for back-up on the third floor. Sgt. Oser witnessed between 15-30 inmates out of their cells and in the hallway. Inmates were known to “pop” their cell doors open. In fact, Sgt. Oser stated that “[i]t happened quite a lot.” When he arrived on the third floor, the inmates stated that Mr. Washington hurt one of the other inmates. Mr. Washington was seen with blood in his mouth and some scratches on his body. Sgt. Oser ordered that Mr. Washington be taken off of the tier and handcuffed. When Mr. Washington was taken to the medical department on the second floor, the nurse stated that “he didn’t have any injuries or not sufficient enough” injuries to require medical care. Sgt. Oser’s report to Sheriff Gusman does not include documentation regarding Mr. Washington’s trip to the medical department. The report also fails to mention or contain information about the physical altercation between Lt. Washington and Mr. Washington.
*522 Sgt, Oser testified that Mr. Washington voluntarily went into the cell on the eighth floor - without incident, but that he was “flailing .wildly” when he was uncuffed. Mr. Washington then struggled, with Lt. Washington, and Sgt. Oser issued verbal commands for Mr. Washington to cease, but he did not comply. Sgt. Oser wanted to get Mr. Washington reevaluated because .he felt that “something wasp’t right.” Lt. Washington, Dep. Tyler, and Lt. Holt put the restraints on Mr. 11 Washington. Sgt. Oser had a broken wrist at the time, so he did not physically participate in restraining Mr. Washington. Sgt. Oser did not think that the chest restraint was used on Mr. Washington, and he does not believe the deputies had time to check the restraints for tightness. Once Mr. Washington’s legs and one arm were restrained, Sgt. Oser noticed something was wrong. Sgt. Oser called for the nurse when he realized Mr. Washington was not breathing. The restraints were removed and Dr. Gautreaux began CPR. Sgt. Oser never witnessed anyone kick, punch, smother, suffocate, or lay on top of Mr. Washington. According to Sgt. Oser, Mr. Washington never said that he could not breathe.

Sidney Holt

Captain Sidney Holt was assigned to the HOD on April 29, 2006, as a watch commander. He received a distress call from the third floor. When he arrived, Mr. Washington had already been taken to the tenth floor. Capt. Holt testified that Mr. Washington was on the floor, resisting in front of the nurses’ station. The doctor instructed the deputies to place Mr, Washington in five-point restraints, ' and he served a supervisory role. Capt. Holt did not observe anything going wrong during the restraint process. He also did not see any deputies beat, kick, choke, strangle, or lay across Mr. Washington’s chest. During cross-examination, Capt. Holt was questioned .regarding an earlier interview with Col. Laughlin.- Capt, Holt previously stated that Mr. Washington was held down by his arms, which were across his chest, by another deputy. Capt. Holt did not recall whether Mr. Washington was bleeding when he saw him on the tenth floor, but he did remember that Mr. Washington was incoherent and babbling.

James Tyler

Sergeant James Tyler was assigned to the tenth floor of the HOD the day 112that Mr. Washington died. Sgt. Tyler was trained on how to administer restraints on inmates and testified that five-point restraints were “a regular thing” on the tenth floor. He was informed that five-point restraints could be dangerous and was aware that it could kill someone if they were improperly applied. Sgt. Tyler stated that Mr. Washington appeared distraught and his mouth was bleeding. Sgt. Tyler did not recall seeing feces on Lt. Washington, but he did not know what occurred before they arrived on the tenth floor. He received an order to restrain Mr. Washington, so he assisted. Sgt. Tyler also checked the tightness of the restraint. Sgt. Tyler testified that the chest strap had not been placed on Mr. Washington. Once someone stated that Mr. Washington was not breathing, life-saving treatment began. Sgt. Tyler never saw anyone strike, kick, he on, or put pressure on Mr. Washington’s chest. Sgt. Tyler himself never struck Mr. Washington. He testified that the deputies were leaning over Mr. Washington, but were not laying on him. Sgt. Tyler stated that “[t]o the best of my knowledge, as best as I can recall, he resisted us pretty much the entire time.” However, while he was restraining Mr. Washington’s right wrist, Mr. Washington “went slack,” and about three minutes ■ later, Dr. Gautreaux arrived. Sgt. Tyler testified that Polaroids *523 were taken during the administration of emergency care to Mr. Washington. However, Sgt. Tyler stated that the pictures went missing after he gave them to the investigators.

Michael Laughlin

Colonel Michael Laughlin was working in the subpoena and capias division when Mr. Washington died. Col. Laughlin was assigned to investigate. Mr. Washington’s death. Col. Laughlin learned that Mr.Washington was allegedly involved in;an altercation with another inmate on the third floor, and that Dr. Gautreaux knocked one of Mr. Washington’s teeth out during the intubation | ^process. Col. Laughlin testified that they knew about the inmates’ ability to open the cell doors at least eight months prior to Mr. Washington’s death. Lastly, Col. Laughlin stated that Dep. Wilson, who assisted Sgt. Washington in escorting Mr. Washington from the third floor, was charged with battery on another inmate, and no longer works for the OPSO.[3]

Lloyd, Grafton

1 Lloyd Grafton, an expert in law enforcement procedure and policy, testified that the “violation of policy and procedure brought about the physical harm and death to Mr. Washington.” None of the reports written by the deputies explained’ the injuries indicated by the autopsy report. “No deputy described-anything that explains all of the injuries to this man’s body.” Mr. Grafton stated that “[i]n my judgment, somebody was trying to harm him physically.” Finally, Mr. Grafton testified that “no lockup, jail or prison in America has a policy of waiting two weeks or longer to notify somebody that they have had the death of a loved one.”

STANDARD OF REVIEW

Appellate courts review findings of fact with the manifest error or clearly wrong standard. Alexander v. Pellerin Marble & Granite, 630 So.2d 706, 710 (La.1994). “Under the manifest error standard, in order to reverse a trial court’s determination of a fact,” we “must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.” Bonin v. Ferrellgas, Inc., 03-3024, pp. 6-7 (La.7/2/04), 877 So.2d 89, 94-95. “On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have |udecided the case differently.” Bonin, 03-3024, p. 7, 877 So.2d at 95.
“[T]he issue to be resolved by a reviewing court- is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.” Stobart v. State through Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993). ‘Where there are two. permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). “When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings” because “only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Id. Where “a factfinder’s finding is based on its decision to credit the ■ testimony of one of two or more witnesses, that finding can virtually *524 never be manifestly erroneous or clearly wrong.” Rosell, 549 So.2d at 845.
If a legal error committed by the trial court “interdicts the fact-finding process, the manifest error standard is no longer applicable.” Snider v. Louisiana Med. Mut. Ins. Co., 13-0579, p. 6 (La.12/10/13), 130 So.3d 922, 929. “[I]f the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence.” Id. “A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial.” Id. “Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.” Id. “[A] de novo review should not be undertaken for every eviden-tiary exclusion error.” In re Succession of Sporl, 04-1373, p. 5 (La.App. 4 Cir. 4/6/05), 900 So.2d 1054, 1058. | f‘De novo review should be limited to consequential errors, which are those that have prejudiced or tainted the verdict rendered.” Id.
“Legal questions are reviewed utilizing the de novo standard of review.” Fornerette v. Ward, 10-1219, p. 4 (La.App. 4 Cir. 5/11/11), 66 So.3d 516, 520.

NEGLIGENCE

Louisiana utilizes a duty/risk analysis to determine if liability should be imposed. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 321. “[I]n order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements”:
(1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).
Id., 94-0952, pp. 4-5, 646 So.2d at 322.

Duty

“The question of whether a duty exists in 'a particular set of circumstances is a question of law for the court to decide.” Mathieu, 94-0952, p. 5, 646 So.2d at 322. “[T]he inquiry is whether the plaintiff has any law — statutory, jurisprudential, or arising from general principles of fault — to support his claim.” Faucheaux v. Terrebonne Consol. Gov’t, 615 So.2d 289, 292 (La.1993). “It is the rule, apart from statutory requirements, that a sheriff or police officer owes a general duty to a prisoner to save him from harm and the officer is liable for the prisoner’s injury or death resulting from a violation of such duty by negligence or |1fiother acts.” Barlow v. City of New Orleans, 257 La. 91, 99, 241 So.2d 501, 504 (La.1970). In other words, “penal authorities have a duty to use reasonable care in preventing harm after they have reasonable cause to anticipate it.” State ex rel. Jackson v. Phelps, 95-2294, p. 3 (La.4/8/96), 672 So.2d 665, 667.
It is undisputed that the Defendants owed Mr. Washington a duty.

Breach of Duty

The Defendants contend that the trial court committed manifest error “by finding that any Defendant failed to exercise reasonable care to protect plaintiff while on the receiving tier.”
“Breach of duty is a question of fact.” Ethyl Corp. v. Gulf States Utilities, Inc., 01-2230, p. 9 (La.App. 1 Cir. 10/2/02), *525 836 So.2d 172, 178. Generally, breach of a duty is the failure to exercise reasonable care under the circumstances.’ ” Id., quoting FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 6-1, at 139 (1996).
The circumstances surrounding Mr. Washington’s demise began when the inmates unlocked and opened their cell doors. Lt. Washington testified that Mr. Washington allegedly slammed another inmate’s hand in a cell door during an altercation. Lt. Washington stated that when Mr. Washington was being escorted to the second and eighth floors, he and Mr. Washington were involved in a struggle, which resulted in him assisting to restrain Mr. Washington on the tenth floor. While Lt. Washington did not receive any formal training on the administration of five-point restraints, he testified that Lt. Bell showed him how to use them. Five-point restraints are no longer used.
Sgt. Oser accepted a call for back-up on the third floor and witnessed between 15-20 inmates in the hallway and out of their cells. Defendants contend |17that no evidence was presented to prove that inmates other than Mr. Washington’s cellmates were in the hallways. This assertion lacks merit. Three cells were located on the third floor. Each cell contained ten inmates. If Sgt. Oser witnessed between 15-30 inmates out of their cells, then more than just Mr. Washington’s cell door was open. Sgt. Oser further testified that inmates were known to “pop” open their locked cell doors because it happened “quite a lot.” Sgt. Oser’s wrist was broken at the time, so he did not physically participate in restraining Mr. Washington. Capt. Holt arrived on the tenth floor as Mr. Washington was resisting in front of the nurses’ station. He served a supervisory role in placing Mr. Washington into five-point restraints. Sgt. Tyler stated that he was trained on how to administer five-point restraints because they were a “regular thing” working on the tenth floor. He was aware that five-point restraints could be dangerous and even cause death. Col. Laughlin testified that they knew about the inmates’ ability to open the cell doors at least eight months prior to Mr. Washington’s death.
The trial testimony demonstrates that the OPSO knew inmates could unlock their cell doors for months prior to Mr. Washington’s death. No testimony was presented that any compensatory measures were undertaken to prevent inmates from unlocking their cells or to control them once they had opened their cells. The trial court judge was tasked as the fact finder to determine the credibility of the witnesses who provided these statements. Accordingly, we do not find that the trial court committed manifest error by finding that the Defendants breached their duty to protect Mr. Washington.

Cause-in-Fact

The Defendants assert that the trial court committed manifest error by finding “that the evidence showed that an act or omission of any Defendant was | isthe cause-in-fact of Plaintiffs death.”
“Cause-in-fact is generally a ‘but for’ inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant’s substandard conduct, such conduct' is a cause-in-fact.” Faucheaux, 615 So.2d at 292. “To the extent that the defendant’s actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met.” Id. “Stated differently, the inquiry is ‘[d]id the defendant contribute to the plaintiff’s harm or is the defendant a cause of the plaintiffs harm?’ ” Roberts v. Benoit, 605 So.2d 1032, 1042 (La.1991), quoting Crowe, The Anatomy of a Tortr-Greenian, as Interpreted by Crowe who *526 has been Influenced by Malone-A Primer, 22 Loy.L.Rev. 903, 920 (1976).
“An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the ‘substantial factor’ test.” Roberts, 605 So.2d at 1042, quoting Fowler v. Roberts, 556 So.2d 1, 5 (La.1989). “Under this test, cause in fact is found to exist when’ the defendant’s conduct was a ‘substantial factor’ in bringing ■ about plaintiffs harm.” Id, “Under either method, it is irrelevant in determining cause in fact whether the defendant’s actions were ‘lawful, unlawful, intentional, unintentional, negligent or non-negligent.’” Id., quoting Green, The Causal Relation Issue in Negligence Law, 60 Mich.L.Rev. 543, 549 (1962). “Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerations-morality, culpability or responsibility-involved in the duty-risk analysis.” Roberts, 605 So.2d at 1042.
The trial court noted that “the testimony of the deputies [was] severely inconsistent with the physical evidence presented at trial.” We agree. Mr. Washington’s death certificate listed cardiac- arrhythmia, respiratory insufficiency, excited delirium, and death during restraint as his causes of death. In conjunction | ^therewith, Dr. Gautreaux testified that an improperly placed chest strap, included in the five-point restraints, could cause respiratory insufficiency. Further, Dr. Posey testified that “something in a restraint form ... was across [Mr. Washington’s] chest and [was] sufficient, enough to rupture the small blood vessels and to contuse and bruise the area.” Dr. Posey also stated that respiratory insufficiency would be present in someone who died from restraint. Sgfc Oser testified that the medical unit determined that Mr. Washington had insufficient injuries from the scuffle with other inmates to warrant medical treatment. The testimony demonstrates that Lt. Washington and Dep. Wilson participated in restraining Mr. Washington. Lastly, Mr. Grafton testified that “[n]o deputy described anything that explains all of the injuries to this man’s body.” We agree. The evidence shows that Mr. Washington did not need medical treatment after his alleged fight with another inmate. The OPSO employees testified that no one kicked, beat, or laid on Mr. Washington. However, “Mr. Washington had lacerations, contusions, a tooth knocked out, abrasions to his neck, back, face, head, chest, lips, side of head, left shoulder, right scapula^ right shoulder, his abdomen, both knees, his foot and deep lacerations across his stomach.” No testimony explains how Mr. Washington received all of these injuries. Accordingly, we do not find that the trial court committed manifest error in its findings that “Mr. Washington’s injuries and subsequent death were caused by actions and/or inac-tions by the defendants.”

Legal Causation

“The scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty.” Faucheaux, 615 So.2d at 293. “Rules of conduct are designed to protect some , persons under some | ^circumstances against some risks.” Id., 615 So.2d at 293-94. “The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner.” Id., 615 So.2d at 294. “In determining the limitation to be placed on liability for defendant’s substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.” Id.
“[P]enal authorities have a duty to use reasonable care in preventing harm after *527 they have reasonable cause to anticipate it.” Phelps, 95-2294, p. 3, 672 So.2d at 667. This duty encompassed the risk that Mr. Washington might get into an altercation, with another inmate,-especially since the inmates could unlock their cell doors. Col. Laughlin testified that OPSO employees knew for at least eight months prior to Mr. Washington’s death that the inmates could open the cell doors. The duty also includes protection from the-' risk of being killed through the use of force. Several OPSO employees were aware that the improper administration of restraints could cause harm. But for the actions/inactions of the Defendants, Mr. Washington might still be alive. See Roberts, 605 So.2d at 1045 (La.1991). Given the facts and circumstances present in this matter, , we do not find that the trial court erred by finding that the Defendants were the legal cause of Mr. Washington’s death.

Actual Damages

“[EJmployers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.” La. C.C. art. 2320. “An employer is responsible for the negligent acts of its employee when the conduct is so closely connected in time, place, and causation, to the employment duties of the employee that it constitutes a risk of harm attributable to 12ithe employer’s business.” Orgeron on Behalf of Orgeron v. McDonald, 93-1353, p. 4 (La.7/5/94), 639 So.2d 224, 227.
The acts leading to Mr. Washington’s death were clearly committed within the course and scope of employment. Mr. Washington died as a result of the Defendants’ negligence. As s,uch, the fifth prong of the negligence requirements was affirmatively satisfied, along with the first four prongs, as discussed above. Therefore, we find that the trial court did not err by holding the Defendants, including Sheriff Gusman, liable for the negligence leading to Mr. Washington’s'death.

FAULT OF MR. WASHINGTON

The Defendants contend that the trial court erred “by failing to allocate fault to Kerry Washington, whose actions precipitated the events which led ■ to his injuries, and further erred in. failing to consider fault of non-parties.”
La. C.C. art. 2323 provides that: the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to-the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute ... or that the other person’s identity is not known or reasonably ascertainable.
“The allocation of fault between comparatively negligent parties is a finding of fact.” Sims v. State Farm Auto. Ins. Co., 98-1613 (La.3/2/99), 731 So.2d 197, 199. “Therefore, an appellate court should only disturb the trier of fact’s allocation of fault when it is clearly wrong or manifestly erroneous.” Duncan v. Kansas City S. Ry. Co., 00-0066, pp. 10-11 (La.10/30/00), 773 So.2d 670, 680.
The trial court determined that the Defendants were one hundred percent liable for the death of Mr. .Washington. As noted above, this is. a factual finding [a2subject to a manifest error review. Dr. Gautreaux ordered that Mr. Washington be placed in five-point restraints once he was calm and subdued. The Defepdants did not wait until Mr. Washington was calm and subdued. Only one witness testified that he received some training on the administration of five-point restraints. OPSO employees knew that inmates could unlock their cell doors for months prior to the incident. Based on these -facts and- cir *528 cumstances, we do not find that the trial court committed manifest error by allocating one hundred percent fault to the Defendants, and affirm.

42 U.S.C. § 1983

The Defendants assert that the trial court “erred in finding liability of Defendants”[4] for “Constitutional violations pursuant to 42 USC 1983.”
42 U.S.C. § 1983 (West) provides that:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer’s judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Supervisory Liability

“Respondeat superior or vicarious liability will not attach under § 1983.” City of Canton, Ohio v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). “A supervisory official may be held liable under section 1983 for the wrongful acts of a subordinate 'when [the supervisory official] breaches a duty imposed by state or local law, and this breach causes plaintiffs constitutional injury.’” Smith v. Brenoettsy, 158 F.3d 908, 911 (5th Cir.1998), quoting Sims v. Adams, 537 F.2d 829, 831 (5th Cir.1976). “To hold a supervisory official so liable, the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiffs rights; and (3) the failure to train or supervise amounts to deliberate indifference.” Id., 158 F.3d at 911-12. “For an official to act with deliberate indifference, ‘the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.’ ” Brenoettsy, 158 F.3d at 912, quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).
“[P]roof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.” Snyder v. Trepagnier, 142 F.3d 791, 798 (5th Cir.1998). “The plaintiff must demonstrate ‘at least a pattern of similar incidents in which the citizens were injured ... to establish the official policy requisite to municipal liability under section 1983.’ ” Id.,Id., 142 F.3d at 798-99, quoting Rodriguez v. Anita, 871 F.2d 552, 554-55 (5th Cir.1989).
The Defendants assert that the trial court “was clearly wrong with its finding that Sheriff Gusman was liable in his official capacity” because Sheriff Gus-man was not personally involved in the events, which would require “the heightened standard of supervisory liability.” The trial court stated that “other similar incidents had occurred in the past yet training still was not implemented.” | ^However, no evidence of any other incidents, much less similar, was admitted or *529 discussed at trial. No previous deaths from restraint were presented to establish a pattern. No previous injuries from restraints that required medical care were presented to establish a pattern. Some of the OPSO employees’ testified that they did not receive formal training on the use of five-point restraints, but there was no evidence presented that would demonstrate a pattern. “[SJhowing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.” Connick v. Thompson, 563 U.S. 51, 131 S.Ct. 1350, 1363, 179 L.Ed.2d 417 (2011). Accordingly, we find that the trial court erred by finding Sheriff Gusman liable in his official capacity pursuant to § 1983 because Mrs. Washington failed to prove a pattern of similar violations, and reverse.

Individual

The United States Fifth Circuit Court of Appeals stated that, in regards to an individual’s § 1983 liability:
Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official’s response indicates the official subjectively intended that harm occur. Hare II [v. City of Corinth], 74 F.3d [633,] at 643, 649-50 [ (5th Cir.1996) ]. However, deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. Id. at 645, 649.
Thompson v. Upshur Cnty., TX, 245 F.3d 447, 458-59 (5th Cir.2001). “A showing of deliberate indifference requires the prisoner to submit evidence that prison officials ‘“refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.” ’ ” Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir.2006), quoting Domino v. Texas Dep’t of Crim. Justice, 239 F.3d 752, 756 (5th Cir.2001), quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir.1985). “Deliberate indifference ‘is an extremely high standard to meet.’ ” Gobert, 463 F.3d at 346.
The “ ‘application of the deliberate indifference standard is inappropriate’ in one class of prison eases: when ‘officials stand accused of using excessive physical force.’” Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994), quoting Hudson v. McMillian, 503 U.S. 1, 6-7, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). “The claimant must show that officials applied force ‘maliciously and sadistically for the very purpose of causing harm.’” Id.
The trial court stated that “Plaintiffs have established deliberate indifference on the part of the Sheriffs office,” but did not explain what that conclusion was based on. After our review, the testimony and evidence presented at trial did not demonstrate that the Defendants acted with deliberate indifference or with a malicious and sadistic intent. While several witnesses testified that they knew five-point restraints carried some risk, the testimony revealed that the OPSO employees were unaware of the five-point restraints previously harming any other prisoners. The showing of “[m]ere negligence or a failure to act reasonably is not enough.” Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir.2003). As such, we find that the trial court erred by finding the Defendants liable pursuant to 42 U.S.C. § 1983, and reverse.

*530
QUALIFIED IMMUNITY

The Defendants aver that the trial court “was clearly wrong in failing to grant qualified immunity on behalf of all Defendants with respect to Plaintiff’s constitutional claims.” Because we,found that the trial court erred by holding all |g6three Defendants liable pursuant to 42 U.S.C. § 1983, a discussion determining whether the trial court erred by not considering qualified immunity is pretermitted.

PUNITIVE DAMAGES

■ The1 Defendants contend that' the trial court “committed manifest error in assessing punitive damages against the Defendants.”
The trial court reasoned that:
the failure to train deputies, lack of policies and procedures and callous nature of the process of notifying family members of injuries or death of an inmate is reprehensible. Mr. Washington’s death was caused by defendants’ failure to safeguard him from harm. Once that right was violated, his family was forced to languish over his whereabouts for nearly two weeks. Mrs. Washington constantly sought information on the whereabouts of her husband, only to be told he was “released.”
The trial court awarded Mrs. Washington $15,000.00 in 42 U.S.C. § 1983 damages.
“[Pjunitive damages ... are typically unavailable in official capacity suits.!’ Sanders-Burns v. City of Plano, 594 F.3d 366, 379 (5th Cir.2010). The Supreme Court opined that “although the precise issue of the availability of punitive damages under § 1983 has never come squarely before us, we have had occasion more than once to make clear our view that they are available[.]” Smith v. Wade, 461 U.S. 30, 35-36, 103 S.Ct. 1625, 1629, 75 L.Ed.2d 632 (1983). However, because we found that the Defendants were not liable pursuant. t.o 42 U.S.C. § 1983,. then punitive damages, are .not available.[5] Accordingly, as there is no 42 U.S..C- § 1983 liability in this case, we vacate the $15,000.00 punitive damages award. Thus, the trial court’s 42 U.S.C. § 1988(b) award is also vacated, as she is | g^no longer, the prevailing party in regards to her constitutional claims.

DECREE

For the above-mentioned reasons, we find that the trial court did not manifestly err by finding the Defendants liable for Mr. Washington’s death, as they breached their duty to keep Mr. Washington safe. The trial court did not commit manifest error by finding that the Defendants were the cause-in-fact .of Mr. Washington’s death because none of the evidence produced at trial explains how he sustained all of his injuries. We also find that the trial court did not err by allocating one hundred percent of the fault to the Defendants.
However, we find that the trial court erred by finding that Sheriff Gusman was liable pursuant to 42 U.S.C. § 1983 because the record was devoid of evidence of a pattern of similar events, and reverse. Similarly, we find that the trial court erred by holding the remaining two Defendants liable pursuant to 42 U-S.C. § 1983 because they did not act with deliberate indifference or sadistic intent, and reverse. Since we reversed the trial court’s findings of 42 U.S.C. § 1983 liability, discussion of qualified immunity was pretermitted. Lastly, because punitive damages are unavailable without constitutional violations, we vacated the trial court’s $15,000.00 *531 award for punitive damages, as well as attorney’s fees. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND RENDERED
TOBIAS, J., concurs in result.
BONIN, J., concurs in result with reasons.

. No other witnesses or statements corroborated this story. No witnesses could remember seeing feces on Lt. Washington or Mr. Washington.

. Lt. Nathan Bell had shown Lt. Washington how to administer five-point restraints.

. Dep. Wilson was not called to testify at the trial.

. Sheriff Gusman was found liable in his official capacity.

. This Court takes note of the ordeal Mrs. Washington endured trying to locate her husband.